

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-5-2001

# Crissman v. Dover Downs Ent., Inc

Precedential or Non-Precedential:

Docket 00-5178

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Crissman v. Dover Downs Ent., Inc" (2001). *2001 Decisions.* Paper 123.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/123

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 29, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-5178

CHARLES CRISSMAN; WENDY CRISSMAN;
*CHRISTINE CRISSMAN,

      Appellants

v.

DOVER DOWNS ENTERTAINMENT INC.;
DOVER DOWNS, INC.

* (Dismissed as Party per Court's 11/8/2000 Or der)

On Appeal From the United States District Court
for the District of Delaware
(C.A. No. 99-cv-00755)
District Judge: Honorable Roderick R. McKelvie

Argued: December 5, 2000

Before: McKEE, ROSENN, and CUDAHY,*
Circuit Judges.

(Filed: January 29, 2001)

      Jeffrey J. Clark (Argued)
      Noel E. Primos
      Schmittinger & Rodriguez
      414 South State Street
      P.O. Box 497
      Dover, DE 19903
       Counsel for Appellants
_____

* Hon. Richard D. Cudahy, Senior Judge, United States Court of Appeals
for the Seventh Circuit, Sitting by Designation.

          Thomas P. Preston (Argued)
          Reed Smith
          1201 Market Street
          Suite 1500
          Wilmington, DE 19801
           Counsel for Appellees

OPINION OF THE COURT

ROSENN, Circuit Judge.

In this appeal, we return to familiar terrain to determine whether the expulsion of three state-licensed horse-trainers and horse owners by a privately owned harness racing association from its racetrack without a hearing constitutes state action for purposes of 42 U.S.C. S 1983. 1 The District Court concluded that no state action was present and granted summary judgment in favor of Dover Downs, the racetrack operator. Because the plaintif fs presented conclusive evidence that the track enjoyed a symbiotic relationship with the State of Delaware, we reverse.

I.

Appellee, Dover Downs, Inc. (Dover Downs), is a subsidiary of Dover Downs Entertainment Inc., a publicly held corporation operated for profit. Dover Downs is licensed by the Delaware Harness Racing Commission (HRC) to conduct harness races at its track in Dover, Delaware. It conducts harness racing meets six months out of every year, during which time no other track in Delaware holds harness racing meets.2 Dover Downs also operates

_____

1. 42 U.S.C. S 1983 provides: "Every person who, under color of any . . . regulation . . . of any state . . . subjects, or causes to be subjected, any
citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or any other
proper proceeding for redress."

2. Harrington Raceway, the only other licensed harness racing facility in Delaware, conducts races during the six months each year that Dover Downs does not.

2

video lottery gambling and other entertainment activities at its facility.

Harness racing is a heavily regulated business in Delaware, as it is in most states. The State of Delaware plays an active role in the management of the harness racing operation at Dover Downs. The State r equires that 14 harness racing officials assigned to Dover Downs, with titles ranging from "equipment checker" to "state veterinarian," be licensed by the HRC. Although Dover Downs pays and supervises these officials, HRC rules set forth their duties and job descriptions in detail. Moreover, HRC rules require Dover Downs to "enfor ce the [Harness Racing] Act and the rules and orders of the Commission."

In 1993, Delaware passed the "Horsemen's Revitalization Act," whose stated purpose was to rejuvenate the declining Delaware horse-racing industry. See 29 Del. C. S 4801(b)(1). To achieve this goal, the legislature authorized harness racetracks such as Dover Downs to operate "video lottery machines", commonly known as slot machines, on the premises. The State, rather than Dover Downs, owns or leases the slot machines, which are dir ectly connected to the Delaware State Lottery Office for monitoring and control. See 29 Del. C. S 4819. Dover Downs, as a "video lottery agent," is responsible for securing and operating the machines, and is free to determine the number of machines it chooses to house, up to the statutory maximum of 1000 machines. See 29 Del. C. S 4820. Nonetheless, a Delaware statute plainly states that the video lottery is operated "by the State Lottery Office." 29 Del. C. S 4815(b)(2).

The State also exercises complete contr ol over the distribution of revenue from the slot machines. A Delaware statute requires Dover Downs to send all r evenue from the lottery machines, net of payouts to patrons, to an account controlled by the State Lottery Office. See Del. C. S 4815(b). The funds received by this account are then distributed in accordance with Delaware statute, which is painstakingly specific. First, the State pays administrative costs associated with the operation of the lottery, including the salaries of state lottery personnel. Next, Gamblers Anonymous and similar programs receive a share. The State then receives a large percentage share of the money

3

that remains. The statute then directs that a percentage of the remaining funds be given to racetracks such as Dover Downs "to be applied under the direction of the Delaware Harness Racing Commission to purses for races conducted at such agent's racetrack." 29 Del. C. S 4815. Finally, Dover Downs, as a video lottery agent, receives a statutorily designated "commission." See 29 Del. C. S 4815(b)(4) c & d.

Charles, Wendy, and Christine Crissman ar e, and at all relevant times have been, duly licensed by the state of Delaware to own and train race horses. In October 1997, Charles Lockhart, the newly-appointed general manager of Dover Downs, informed the Crissmans that they were no longer welcome at Dover Downs and that Dover Downs would no longer permit them to race horses there. Lockhart offered the Crissmans no explanation for their exclusion and no opportunity to be heard. Lockhart's deposition in this proceeding discloses that he expelled the Crissmans because he had heard unconfirmed rumors that the HRC was investigating Charles Crissman for certain alleged improprieties. Lockhart decided to exclude W endy and Christine Crissman only because they had applied jointly with Charles Crissman to race at Dover Downs. The Crissmans, however, were all licensed in good standing and there is no indication of record that they had violated Delaware's harness racing rules.3

The Crissmans filed suit against Dover Downs under 42 U.S.C. S 1983 in the United States District Court for the District of Delaware. The complaint alleged that Dover Downs had denied the plaintiffs due pr ocess of law in violation of the Fourteenth Amendment to the United States Constitution. The plaintiffs sought damages, as well as preliminary and permanent injunctive r elief restraining the defendants from denying them access to the racetrack. When they filed their complaint, the Crissmans moved for a temporary restraining order. The District Court denied the motion, holding that the Crissmans were unlikely to prevail on the merits. Dover Downs then moved for summary judgment. The District Court granted the motion, holding

_____

3. On or about November 1, 2000, Christine Crissman stipulated to a dismissal of her appeal with prejudice.

4

that the Crissmans had failed to adduce sufficient evidence that Dover Downs acted under color of state law as required by 42 U.S.C. S 1983.

II.

The primary question presented by this lawsuit is whether Dover Downs' exclusion of the Crissmans constituted state action, a necessary element of a successful section 1983 suit. The starting point for our state action analysis is the seminal case of Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856 (1961). In that case, the plaintiff sued a privately owned restaurant for racial discrimination. The r estaurant leased the land on which it stood from a state agency, which ran the adjacent public parking garage. After examining the close relationship between the restaurant and the state agency, the Supreme Court concluded that state action was present. The Burton Court enunciated a"symbiotic relationship" test. It provides that when the state has not clearly directed the private act of discrimination, but it "has so far insinuated itself into a position of inter dependence" with the private actor, the state "must be recognized as a joint participant in the challenged activity." Id. at 725; Fitzgerald v. Mountain Laurel Racing, Inc. , 607 F.2d 589, 594 (3d Cir. 1979). The Court emphasized that"only by sifting facts and weighing circumstances can the nonobvious involvement of the state in private conduct be attributed its true significance." Id. at 722.

The Court later refined the symbiotic r elationship test in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965 (1972). There, the Court held state action to be absent in a case challenging racial discrimination by a private club that was heavily regulated by the Pennsylvania Liquor Control Board. The essence of the Court's holding was that extensive and detailed regulation of a private entity is generally insufficient to convert that entity into a state actor. See id. at 176-177. The Court distinguished the situation in Moose Lodge from that in Burton on the ground that, unlike the private restaurant in Burton, the Moose Lodge was a private club operating on private land and that the regulation of the Moose Lodge, detailed as it was in

5

some particulars, could not be said "to in any way foster or encourage racial discrimination." Id. at 176-177. In addition, the court noted that, in spite of the r egulation to which the State subjected the Moose Lodge, the State could not be said to be "a partner or even a joint venturer in the club's enterprise." Id. at 177.

III.

Summary judgment is appropriate only when the r ecord could not lead a reasonable jury to find for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). The court making this determination must view the evidence in the light most favorable to the non-movant. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

Dover Downs attempts to portray its relationship to the State as one consisting solely of "regulations and revenue." Such a relationship is generally insufficient to constitute a symbiotic relationship under Burton. See Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350 (1974); Hadges v. Yonkers Racing Corp., 918 F.2d 1079, 1082 (2d Cir. 1990). However, we believe that the r ecord in this case shows that the affairs of the State and the racetrack were much more than a regulatory relationship between the State and a private gambling enterprise. For instance, the slot machines used by Dover Downs, like the leased restaurant building in Burton, ar e the property of, or leased by, the State. Cf. Fulton v. Hecht, 545 F.2d 540, 542-43 (5th Cir. 1977)(finding symbiotic r elationship absent and emphasizing that private party was not a lessee of state property). The State maintains control over these slot machines by directly connecting them to the central computer system at the State Lottery Office. In addition, and perhaps most important to the symbiotic r elationship analysis, Dover Downs is the State's agent in the video lottery enterprise. Because of this agency r elationship, the State stands to gain or lose substantial revenue as a result of business decisions made by Dover Downs.4 The situation

_____

4. As it turns out, the stakes are quite high. In 1998, slot machines from Delaware's three video lottery agents br ought $206 million into Delaware's General Fund.

6

here is even more striking than the symbiotic relationship found in Burton, where the State primarily acted as landlord to the privately-owned restaurant and had no direct stake in its financial success beyond its ability to pay rent.

Dover Downs urges this court to view the video lottery operation in which, Dover Downs concedes, the State is heavily involved, as separate from its har ness-racing activities. It argues that, because the Crissmans were banned from participating in harness races, this court should only analyze the State's connection to Dover Downs' harness racing operation. This argument misses the point of the symbiotic relationship test,[5] which predicates state action not merely on its participation in the challenged conduct, but on the overall involvement of the State in the affairs of the private entity. See Braden v. University of Pittsburgh, 552 F.2d 948, 958 (3d Cir. 1977)(holding that symbiotic relationship test does not require that the state be involved in the challenged action). The purpose behind the Burton decision was to recognize a state as "a joint participant in the challenged activity" when it has "insinuated itself into a position of inter dependence with" the private actor. Burton, 365 U.S. at 725. When such a relationship of interdependence exists, aS 1983 plaintiff need not show state participation in the challenged activity. See id. at 958.

Moreover, Dover Downs' contention that we should ignore the State's involvement in the video lottery is not persuasive because the record reflects that video lottery is inextricably linked with Dover Downs' harness-racing operation. The State of Delaware created the video lottery for the express purpose of providing "assistance in the for m of increased economic activity and vitality for Delaware's harness and thoroughbred horse racing industries, which activity and vitality will . . . cause increased employment." See 29 Del.C.

_____

5. Dover Downs' argument is more in tune with the "close nexus" test, articulated by the Supreme Court in Jackson v. Metropolitan Edison Co., 419 U.S. 345 (1974), which held that, in the absence of a symbiotic relationship, state action may be found if the state was a participant in the challenged activity.

7

S 4801(b)(1). Under Delaware law, Dover Downs would not be permitted to operate a video lottery if it did not conduct harness racing meets. See 29 Del. C.S 4819(a). To effectuate the stated purpose of the statute, Delaware gives a portion of the lottery's revenue to Dover Downs to be applied to harness racing purses "under the direction of the Delaware Harness Racing Commission." 29 Del. C. S 4815(b)(3) b.2. Thus, the recipients of harness racing purses are direct beneficiaries of r evenues derived from the video lotteries jointly operated by the State and the race track. Furthermore, Dover Downs also specifically participates in the revenues generated by the video lottery.

Finally, we note that the State of Delaware is involved in Dover Downs' harness racing activities. Ther e are many positions which Dover Downs is not permitted to fill without State approval. The HRC requir es no fewer than 14 harness racing officials to be licensed 6 and it reserves the right to designate other positions that requir e licenses. Although Dover Downs pays and supervises these officials, HRC rules describe their duties and responsibilities in detail. Most importantly, HRC rules requir e Dover Downs not only to abide by, but also to "enfor ce the [Harness Racing] Act and the rules and orders of the Commission." (App. at 67)(emphasis added). In Jackson, the Supreme Court stated that the petitioner's case for state action would have been stronger if the private actor had "exercise[d] . . . some power delegated to it by the State which is traditionally associated with sover eignty." Jackson, 419 U.S. at 352-53. The power to enforce laws is one such power, the delegation of which converts Dover Downs into an executive arm of the HRC. Of course, heavy state regulation alone of a private entity does not necessarily give rise to a Burton symbiotic relationship. However, the undisputed facts here show such a deliberate entwining and interdependence between the State and Dover Downs, not only in the operation of the State Lottery but also in the

_____

6. The following individuals must be licensed by the HRC: state steward, board of judges, racing secretary, paddock judge, horse identifier and equipment checker, clerk of the course, official starter, official charter, official timer, photo finish technician, patrol judge, program director, State veterinarian, and LASIX veterinarian. (App. at 59).

8

harness racing operations at the track. The State's concerns in the "economic activity and vitality" of the racetrack operation is a matter of statutory expr ession. The overall involvement of the State in the affairs of the race track is manifest. We reject, ther efore, Dover Downs' arguments that the State specifically must be involved in the challenged activity or that the lottery activities can be insulated from the race track operations.

For all of the reasons discussed above, the Crissmans have established that a symbiotic relationship exists between Delaware and Dover Downs. The District Court's grant of summary judgment for Dover Downs on the state action issue will therefore be reversed.

IV.

Our inquiry does not end with the state action analysis because, even if state action is present, the Crissmans must also demonstrate a triable issue of material fact as to whether their constitutional right to Due Pr ocess was violated. We must now consider whether the Crissmans made such a showing, a question which the District Court did not address.

In Fitzgerald v. Mountain Laurel Racing , supra, this Court held that a horse trainer who had been summarily evicted from the track where he previously raced had made out a case of deprivation of due process. This court recognized that "Fitzgerald had a liberty interest in his employment reputation protected by the Due Pr ocess Clause of the fourteenth amendment." Id. The court further noted his liberty interest in earning a livelihood, stating,

> Mountain Laurel had officially recognized Fitzgerald's status as a state licensed trainer and driver by allowing him to perform these activities at the track. His summary expulsion significantly altered a`status previously recognized by state law' and denied him the opportunity of earning a livelihood. W e, therefore, agree that Fitzgerald has a cognizable liberty inter est.

Id., quoting Paul v. Davis, 424 U.S. 693, 711 (1976).

The facts of this case bear considerable similarity to those in Fitzgerald. Like Fitzgerald, the Crissmans are and have been at all relevant times, licensed by the state of Delaware to train and race horses. Prior to the challenged expulsion, Dover Downs had recognized that status by allowing them to race their horses there. Moreover, the expulsion "significantly altered a status previously recognized by state law" by prohibiting them from using their Delaware racing licenses during the six months each year when Dover Downs conducts the only harness racing meets in the state.

Dover Downs argues that it "has not taken any action to impede Appellants from pursuing their employment at any other track."7 However, it is not necessary under Fitzgerald for the Crissmans to prove that they can no longer race anywhere in order to make out a S 1983 case. Fitzgerald, like the Crissmans, was only evicted from one track. There is nothing in the opinion to indicate that he was banned from racing anywhere or even that he was banned from racing throughout Pennsylvania. Although the Crissmans are still free to race their horses at Harrington Raceway and at tracks in other states, their Delaware racing licenses are of no use to them for half of every year because of Dover Downs' summary expulsion.

Dover Downs also disputes whether the Crissmans' reputations were damaged by their exclusion from the

_____

7. Dover Downs cites Greene v. McElroy, 360 U.S. 474 (1959) as support for the proposition that the denial of an employment opportunity does not amount to a liberty or property right unless the plaintiff is entirely deprived of his ability to earn a living in his chosen profession. However,
Greene erects no such barrier to Due Process claims based on the denial of employment opportunities. Rather, it merely noted that in that case, the plaintiff 's career had been "seriously affected, if not destroyed" by the government's action. Id. at 492. It then stated that the right "to follow a chosen profession free from unreasonable governmental interference comes within the liberty and property concepts of the Fifth Amendment." Id. at 492. It is consistent with Greene to hold that eviction from a track in a state where one is licensed to race constitutes an unreasonable interference with the pursuit of one's chosen profession, particularly when that track is the only place in the state that one can practice one's profession from November through April.

track. It accurately points out that, in Fitzgerald, a Pennsylvania Racing Commission Rule requir ed the track to notify the Commission of all people excluded ther efrom. Delaware, it seems, has no comparable r egulation. Dover Downs seizes on this distinction and maintains that, except to the extent that the Crissmans themselves publicized their exclusion, their reputations have not been damaged by this incident. On the other hand, their exclusion in all probability would be known to the other owners and trainers of race horses at the Dover Downs track, and those associated with them. In our view, the Crissmans have presented sufficient evidence to warrant trial on this issue.

Dover Downs acknowledges that the HRC was notified orally of the Crissmans' expulsion. Although Dover Downs tries to downplay the significance of this notification, Fitzgerald held that the notification of the r elevant regulatory agency amounts to a deprivation of the plaintiff 's liberty interest in his employment reputation. See Fitzgerald, 607 F.2d at 602. Moreover, Charles Lockhart's deposition reveals that this notification was only given after an HRC employee asked him whether Mr. Crissman had been excluded from the track. Apparently, the HRC agent asked "because he had heard that [Crissman] had been [excluded]." (App. at 260). This testimony demonstrates that the expulsion of the Crissmans from Dover Downs has, at some point, been the subject of conversation in Delaware harness racing circles. Although it r emains possible that the Crissmans themselves are primarily r esponsible for the publicity surrounding their exclusion, we believe, viewing the evidence in the light most favorable to the Crissmans, that there is a genuine issue of fact as to whether Dover Downs' expulsion adversely affected their r eputation.

We conclude that the Crissmans have pr esented a triable issue of fact as to whether their expulsion fr om Dover Downs amounted to a deprivation of a liberty inter est cognizable under S 1983 and an injury to their liberty interest in employment reputation. The question then remains whether they received due pr ocess of law. Under Fitzgerald, a suspended harness racing trainer is entitled, at the very least, to a reasonably prompt post-suspension hearing. See Fitzgerald, 607 F.2d at 603. It is undisputed

11

that the Crissmans never received any hearing. Accordingly, the District Court erred in granting summary judgment for Dover Downs and we will remand this case for trial.

V.

Finally, the Crissmans ask this court to reverse the District Court's denial of their motion for a pr eliminary injunction. A court ruling on a motion for a pr eliminary injunction must consider the following four factors:

> 1) whether the movant has shown a reasonable probability of success on the merits; 2) whether the movant will be irreparably injured by denial of the relief; 3) whether granting preliminary r elief will result in even greater harm to the nonmoving party; and 4) whether granting the preliminary relief will be in the public interest.

Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999). We review the denial of a preliminary injunction only for "an abuse of discretion, a clear error of law, or a clear mistake on the facts." Id.

In light of our determination that a symbiotic relationship existed between the State of Delaware and Dover Downs and based on substantial evidence presented by the Crissmans that they were denied due process of law, we believe they had a reasonable chance of succeeding on the merits.

The other three factors also cut in favor of the Crissmans. The Crissmans have suffered irreparable harm due to the denial of the injunction "because the nature of harness racing is such that no adequate r emedy exists at law to compensate [them] for losses to income and reputation sustained from an unlawful suspension." Fitzgerald, 607 F.3d at 601. Ther e is no evidence that Dover Downs would be harmed if the Crissmans wer e allowed to race. Finally, there is no evidence that the public would be adversely affected if the Crissmans wer e reinstated at Dover Downs. Thus, the District Court's denial of the Crissmans' motion for preliminary injunctive relief will be reversed.

VI.

Accordingly, for the reasons set forth above, summary judgment in favor of Dover Downs, Inc. will be r eversed and the case remanded to the District Court, with directions to grant plaintiffs' motion for preliminary injunctive relief, and for such further proceedings as are consistent with this opinion.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

13