PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4328
_____

AMERICAN EXPRESS TRAVEL RELATED SERVICES,
INC.,

Appellant

v.

ANDREW P. SIDAMON-ERISTOFF,
as Treasurer of the State of New Jersey;
STEVEN R. HARRIS, as Administrator of
Unclaimed Property of the State of New Jersey
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-10-cv-04890)
District Judge:  Honorable Freda L. Wolfson
_____

Argued September 12, 2011
Before:  SCIRICA, SMITH and FISHER, *Circuit Judges*.

(Filed:  January 5, 2012)

Philip R. Sellinger (Argued)
Louis Smith
Greenberg Traurig
200 Park Avenue
P.O. Box 677
Florham Park, NJ  07932

Richard M. Zuckerman (Argued)
SNR Denton US
1221 Avenue of the Americas, 24th Floor
New York, NY  10020
        *Counsel for Appellant*

Robert T. Lougy (Argued)
Gregory A. Spellmeyer
Office of Attorney General of New Jersey
25 Market Street
Richard J. Hughes Complex
Trenton, NJ  08625
        *Counsel for Appellees*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

American Express Travel Related Services ("Amex") challenges the constitutionality of 2010 N.J. Laws Chapter 25 ("Chapter 25"), which amended New Jersey's unclaimed property statute, N.J. Stat. Ann. § 46:30B (2002), and retroactively reduced the period after which travelers checks

are presumed abandoned from fifteen years to three years.[1] Amex filed a motion for preliminary injunction against New Jersey Treasurer Andrew P. Sidamon-Eristoff ("Treasurer") and New Jersey Unclaimed Property Administrator Steven R. Harris (collectively, "New Jersey" or "State") in the District Court on the grounds that Chapter 25's provision reducing the abandonment period for travelers checks violates the Due Process Clause, the Contract Clause, the Takings Clause, and the Commerce Clause of the United States Constitution. The District Court denied Amex's motion, holding that Amex failed to show a likelihood of success on the merits of its claims. Amex filed a timely appeal. For the reasons discussed below, we will affirm the District Court's order.

## I. Background and Procedural History

Amex Travelers Cheques ("TCs")[2] are preprinted checks for amounts ranging from $20 to $100. Each one is identifiable based on a unique serial number. Amex maintains that the TCs never expire, so they are contractually obligated to honor the TCs once they are issued. Amex sells TCs for the face value amount, normally through a third party

---

[1] This opinion addresses the challenge brought against 2010 N.J. Laws Chapter 25 ("Chapter 25") with respect to travelers checks. We discuss the appeal filed by New Jersey Retail Merchants Association, New Jersey Food Council, and American Express Prepaid Card Management Corporation, seeking to enjoin Chapter 25 with respect to stored value cards ("SVCs"), in a separate opinion.

[2] We use "TCs" to refer to Amex Travelers Cheques specifically, as opposed to travelers checks generally.

bank or travel service. The third party can charge a small fee, which it retains, but Amex does not charge a fee beyond the face value of the TCs. Amex claims that it can sell TCs without charging a fee because its contractual relationship with TC owners gives Amex the right to retain, use, and invest funds from the sale of TCs from the date of sale until the date the TCs are cashed or used. Amex asserts that this right to invest the funds is integral to the contract between TC owners and Amex, and that it relies on these invested funds to remain profitable in the TC business.

When a TC is sold, the third party seller transmits the funds to Amex and provides Amex with the TC's serial number, its amount, and the date and place of sale. Generally, the seller does not provide the purchaser's name, address, or any other identifying information. When Amex sells TCs directly to consumers, it retains only the same information that it receives from third party sellers.

All fifty states, and the District of Columbia, have a set of unclaimed property laws (often called escheat laws), most of which are based on a version of the Uniform Unclaimed Property Act ("UUPA"). These laws require that once property has been deemed abandoned, the holder turn it over to the state while the original property owner still maintains the right to the property. The purpose of unclaimed property laws is to provide for the safekeeping of abandoned property and then to reunite the abandoned property with its owner. Usually, before turning over abandoned property to the state, the holder must attempt to return the property by contacting the owner, using the owner's name and last known address. If the holder is unable to return the property to the owner and turns it over to the state, the holder provides the state with the name and last known address of the owner. The holder is no

4

longer liable to the property owner once it turns over the property to the state. The state then makes an effort to reunite the owner with the property. Under New Jersey's custodial escheat statute, the rightful owner may file a claim to recover the property at any time after the property is turned over to the State.

However, travelers checks operate differently because issuers like Amex generally do not obtain the names or addresses of the purchasers. Thus, the requirement that holders send notice to the owner at the last known address before turning over such property to the State does not apply to travelers checks. Travelers check issuers are also exempted from the requirement to include the owner's name and last known address on unclaimed property reports. N.J. Stat. Ann. § 46:30B-47 (2002). Amex sends only the serial number, amount, and date of sale when TCs are sent to the State as unclaimed property. If Amex determines that a cashed TC has a serial number indicating that it has been paid to a state as unclaimed property, Amex seeks to reclaim those funds from that state. In New Jersey, when such claims are filed, the Treasurer returns the funds with interest.

5

Until recently, all fifty states had a fifteen-year abandonment period for travelers checks.[3] But on June 24, 2010, the New Jersey Legislature passed Chapter 25, which shortened the abandonment period for travelers checks from fifteen years to three years. N.J. Stat. Ann. § 46:30B-11 (2010). The purpose of the statute was to "protect New Jersey consumers from certain commercial dormancy fee practices and to modernize New Jersey's unclaimed property laws." State of N.J. Assemb. Budget Comm., Statement to Assembly, No. 3002, 214th Leg., at 1 (June 24, 2010). Under the State's unclaimed property law, after an issuer transfers the presumed abandoned property to the State, the property is then administered through New Jersey's unclaimed property system. The State preserves the property in perpetuity for the owner, N.J. Stat. Ann. § 46:30B-9 (2002), or for another state that can prove a superior right of escheat. N.J. Stat. Ann. § 46:30B-81 (2002).

On September 23, 2010, Amex filed a complaint in the United States District Court for the District of New Jersey, alleging that Chapter 25 violated the Due Process Clause, the Contract Clause, the Takings Clause, and the Commerce Clause of the Constitution. Amex also filed a motion for

---

[3] Recently, Kentucky also shortened its abandonment period for travelers checks from fifteen years to seven years. Although Amex successfully challenged Kentucky's statute in federal district court on substantive due process grounds, *Am. Express Travel Related Serv. v. Kentucky*, 597 F. Supp. 2d 717 (E.D. Ky. 2009), the United States Court of Appeals for the Sixth Circuit reversed and remanded, holding that the statute withstood rational basis scrutiny. *Am. Express Travel Related Servs. v. Kentucky*, 641 F.3d 685 (6th Cir. 2011).

preliminary injunction, seeking to enjoin the State from enforcing Chapter 25.  On November 13, 2010, the District Court denied Amex's motion for preliminary injunction with respect to travelers checks.  Amex filed a timely appeal.

## II.  Standard of Review

"We generally review a district court's [grant or] denial of a preliminary injunction for abuse of discretion[,] but review the underlying factual findings for clear error and examine legal conclusions de novo."  *Brown v. City of Pittsburgh*, 586 F.3d 263, 268 (3d Cir. 2009) (citation omitted).  "We have jurisdiction to review the order [granting or] denying a preliminary injunction under 28 U.S.C. § 1292(a)(1)."  *Id.* at 268 n.6.

## III.  Discussion

A court must consider four factors when ruling on a motion for preliminary injunction:  "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest."  *Crissman v. Dover Downs Entm't Inc.*, 239 F.3d 357, 364 (3d Cir. 2001).  The moving party's failure to show a likelihood of success on the merits "must necessarily result in the denial of a preliminary injunction."  *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982).  We evaluate the likelihood of success on the merits of Amex's four constitutional claims accordingly.

### A.  Substantive Due Process Clause

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.  It is well established that the Due Process Clause contains both a procedural and substantive component. *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000) (citing *Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833, 846-47 (1992)).  Substantive due process contains two lines of inquiry: one that applies when a party challenges the validity of a legislative act, and one that applies to the challenge of a non-legislative action.  *Id.*  In a case challenging a legislative act, as here, the act must withstand rational basis review.  *Id.*  To do so, the defendant must demonstrate (1) the existence of a legitimate state interest that (2) could be rationally furthered by the statute. *Id.* (citation omitted).  The rational basis test, although "not a toothless one," *Mathews v. Lucas*, 427 U.S. 495, 510 (1976), requires significant deference to the legislature's decision-making and assumptions.  *Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 645 (3d Cir. 1995).  "[T]hose attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it[.]'"  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

Amex argues that the sole purpose behind enacting Chapter 25 was to raise revenue for the State, which is not a legitimate state interest.  But under rational basis scrutiny, a court's inquiry is limited to whether the law "rationally furthers *any* legitimate state objective."  *Malmed v. Thornburgh*, 621 F.2d 565, 569 (3d Cir. 1980) (emphasis

8

added). It is enough that the State offers a conceivable rational basis for its action, and "[t]he court may even hypothesize the motivations of the state legislature to find a legitimate objective promoted by the provision under attack." *Id.* (citation omitted). It is "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision . . . ." *Fleming v. Nestor*, 363 U.S. 603, 612 (1960).

The State submits that Chapter 25 was enacted to modernize the State's unclaimed property laws by making the abandonment period for travelers checks more consistent with that of other property. The State also argues that Chapter 25 provides greater protection for property owners. They reason that shortening the abandonment period will facilitate the transfer of the property from a private company to the State at an earlier time; this would provide greater protection for property owners because private companies are subject to greater economic instability compared to a perpetually solvent government entity. In general, taking custody of abandoned property is a legitimate state interest. *See Delaware v. New York*, 507 U.S. 490, 497 (1993) ("States as sovereigns may take custody of or assume title to abandoned personal property. . . ."). We agree that, as a corollary, the State has a legitimate interest in protecting its property owners and modernizing its unclaimed property laws to promote consistency. Accordingly, we reject Amex's contention that Chapter 25 lacks a legitimate state interest.

Amex contests that even if there are legitimate state interests, Chapter 25 fails to rationally further these goals. Because Amex has the burden of rebutting every conceivable rational basis, *see Beach Commc'ns*, 508 U.S. at 315, we examine each of Amex's arguments in turn.

Amex first argues that shortening the abandonment period has no rational relationship to increasing property protection because 90% of travelers checks not used after three years are used within fifteen years. Thus, Amex contends, it is irrational to conclude that travelers checks can be presumed abandoned after three years. But the statistics also show that over 96% of all travelers checks are redeemed within three years. Decl. of Susan Helms at 3, *Am. Express Travel Related Servs.*, 755 F. Supp. 2d 556 (D. N.J. 2010) (No. 10-4328). Even if Amex disagrees with the State Legislature's presumption that travelers checks unredeemed after three years are abandoned, the rational basis test does not require mathematical precision in the legislature's decisions. *See Heller v. Doe*, 509 U.S. 312, 321 (1993). "[L]egislative choice . . . may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315. Thus, Amex's argument is insufficient to overcome rational basis scrutiny.

Amex next argues that shortening the abandonment period for travelers checks does not further Chapter 25's stated purpose of modernizing the State's unclaimed property laws. But the State has a conceivable legitimate interest in making its unclaimed property laws more consistent for ease of administration. Chapter 25 accomplishes this by making the abandonment period for travelers checks the same as checks, drafts, and other similar negotiable instruments. *See* N.J. Stat. Ann. § 46:30B-16 (2002). Amex responds that unclaimed property laws require establishing different time periods based upon the nature of the property, so consistency is not a rational basis for selecting an abandonment period. But state laws cannot be invalidated based on mere policy disagreements. *See Casey*, 505 U.S. at 849 (holding that

10

under rational basis scrutiny, courts are not free to invalidate state law because they disagree with the underlying policy decisions). Because modernizing unclaimed property laws through consistent abandonment periods is a conceivable rational basis for enacting Chapter 25, Amex fails to overcome rational basis scrutiny.[4]

In addition, the State Legislature could have rationally believed that the shorter abandonment period better protected customers by giving custody of the property to the State at an earlier time. Conceivably, there are benefits to having property safeguarded by a perpetually-solvent sovereign instead of a private entity with a greater risk of insolvency. In addition, the State can hold the travelers check funds in perpetuity and must invest unclaimed property funds more conservatively than Amex is required to invest its TC funds. *Compare* N.J. Stat. Ann. § 17:15C-2 (2000) (permitting investment in "any investment which is rated in one of the three highest rating categories by a nationally recognized statistical rating organization") *with* N.J. Stat. Ann. § 46:30B-75 (2000) (restricting investments of funds of Unclaimed Property Trust Fund to government bonds or interest-bearing notes or obligations). The State has offered several legitimate interests that justify shortening the abandonment period for travelers checks from fifteen years to three years. Chapter 25

---

[4] Amex also contends that changing the abandonment period does not rationally further the statute's purpose of reuniting property with its owners because the State does not have the names and addresses of travelers check purchasers. But, as discussed above, changing the abandonment period conceivably furthers other rational bases, which is sufficient for Chapter 25 to survive rational basis scrutiny.

11

rationally furthers these interests, and Amex does not meet its burden of defeating every conceivable basis that might support Chapter 25's enactment. *See Beach Commc'ns*, 508 U.S. at 315. Therefore, Amex fails to show a likelihood of success on the merits of its substantive due process claim.

## B.  Contract Clause

The Contract Clause under Article I, Section 10, Clause 1 of the U.S. Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." To ascertain whether there has been a Contract Clause violation, a court must first inquire whether the change in State law has "operated as a substantial impairment of a contractual relationship." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (citations omitted); *Nieves v. Hess Oil Virgin Islands Corp.*, 819 F.2d 1237, 1243 (3d Cir. 1987) (citations omitted). If this threshold inquiry is met, the court must then determine "whether the law at issue has a legitimate and important public purpose." *Transport Workers Union of Am., Local 290 v. S.E. Pa. Transp. Auth.*, 145 F.3d 619, 621 (3d Cir. 1998). If so, the court must ascertain "whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in light of that purpose." *Id.* Where the contract is between private parties, courts may "defer to legislative judgment as to the necessity and reasonableness of a particular measure." *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977). But this review of legislative judgment is more exacting than the rational basis standard applied in the due process analysis. *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984).

Amex fails to show that Chapter 25 imposes a substantial impairment on Amex's contractual relationships with TC owners. While Amex has the right to use and invest TC funds until the date the TC is cashed or sold, the duration of use is further subject to the lawful abandonment period set by unclaimed property laws. The Supreme Court has long established that

> the contract of deposit does not give the banks a tontine right to retain the money in the event that it is not called for by the depositor. It gives the bank merely the right to use the depositor's money until called for by him or some other person duly authorized. If the deposit is turned over to the state in obedience to a valid law, the obligation of the bank to the depositor is discharged.

*Sec. Sav. Bank v. California*, 263 U.S. 282, 286 (1923) (citation omitted). In *Anderson National Bank v. Luckett*, the Supreme Court again stated that "[s]ince the bank is a debtor to its depositors, it can interpose no due process or contract clause objection to payment of the claimed deposits to the state, if the state is lawfully entitled to demand payment . . . ." 321 U.S. 233, 242-43 (1944) (citation omitted). Like banks, Amex, as a debtor to the TC purchasers, only has the right to use the funds received from issuing a TC until either the owner or the State, under a valid law, claims the funds. Accordingly, a state's ability to claim abandoned property in the travelers check context does not ordinarily substantially impair travelers check issuers' contractual relationships or

13

otherwise violate the Contract Clause.[5]  *See Sec. Sav. Bank*, 263 U.S. at 285-86.

In assessing substantial impairment under the Contract Clause, we look to "the legitimate expectations of the contracting parties," *U.S. Trust Co. of N.Y.*, 431 U.S. at 19 n.17 (1977), and whether the modification imposes an obligation or liability that was unexpected at the time the parties entered into the contract and relied on its terms.  *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978).  An important factor in determining the substantiality of any contractual impairment is whether the parties were operating in a regulated industry.  *See Energy Reserves Grp., Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 411 (1983) (citing *Allied Structural Steel Co.*, 438 U.S. at 242 n.13).  When a party enters an industry that is regulated in a particular manner, it is entering subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships are foreseeable.  *See id.*  New Jersey has consistently regulated travelers checks, both generally under the Money Transmitter Law, N.J. Stat. Ann. § 17:15C (2000), and as abandoned property under the unclaimed property statute, N.J. Stat. Ann. § 46:30B-11 (2010).  Given such consistent regulation, Chapter 25's amendment of the abandonment period did not upset Amex's legitimate

_____

[5] This analysis differs from the analysis with respect to issuers of SVCs because, unlike travelers checks or bank deposits, SVCs are not redeemable for cash.  Thus, the relationship between SVC purchasers and their issuers is distinguishable from the relationship between depositors and banks, which are required to turn over the value of the deposit in cash upon the depositor's demand.

expectations as the contracting party or impose an unexpected change in its contractual obligations. *U.S. Trust*, 431 U.S. at 19 n.17 (stating "a reasonable modification of statutes . . . is much less likely to upset expectations than a law adjusting the express terms of an agreement").

Amex next claims that the fifteen-year abandonment period was an implied term of the contract for TCs that were sold prior to the enactment of Chapter 25. It is true that the terms of a contract often include the state law relating to the contract. *See Farmers & Merchs. Bank of Monroe v. Fed. Reserve Bank of Richmond*, 262 U.S. 649, 660 (1923). But not all "state regulations are implied terms of every contract entered into while they are effective, especially when the regulations themselves cannot be fairly interpreted to require such incorporation." *Gen. Motors*, 503 U.S. at 189. And "state laws are implied into private contracts regardless of the assent of the parties only when those laws affect the validity, construction, and enforcement of contracts." *Id.* (citation omitted). Critically, the adjustment of the abandonment period merely shortens the time during which Amex can invest the TC funds, without affecting the validity, construction, and enforcement of the contract between Amex and its customers. Amex also fails to show how New Jersey law pertaining to unclaimed property can be interpreted to

15

require incorporation into Amex's contract with its customer.[6] Because Amex has not shown that Chapter 25 constitutes a substantial impairment on this contractual relationship, it did not succeed in showing a likelihood of success on its Contract Clause claim.

## C.    Takings Clause

The Takings Clause of the Fifth Amendment prohibits the federal government from taking private property for public use without providing just compensation. U.S. Const. Amend. V.   The Takings Clause applies to state action through the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980) (citing *Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 239 (1897) and *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 122 (1978)).   When a state directly appropriates private property, it is considered a *per se* taking, and the state has a duty to compensate the owner. *Tahoe-Sierra Pres.*

---

[6] Amex's reliance on *Nieves v. Hess Oil Virgin Is. Corp.*, 819 F.2d 1237 (3d Cir. 1987) is misplaced.  In *Nieves*, a 1986 amendment to the Virgin Island's Workmen's Compensation Act retroactively eliminated an employer's immunity from tort actions.  819 F.2d at 1248.  Because the employer had immunity under the law at the time of the contract, this amendment exposed the employer to significant additional tort liability that was unexpected. *Id.*  Chapter 25, however, does not impose an unexpected *liability* on Amex that would "completely destroy[] its contractual expectations." *Id.* at 1248.  It only seeks to retroactively claim abandoned travelers checks that ultimately belong to the purchasers, not Amex.

16

*Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002). Where, as here, a party asserts a regulatory taking, there is no set formula. Rather, courts must engage in a factual inquiry to determine whether a taking has been effected. *New Jersey v. United States*, 91 F.3d 463, 468 (3d Cir. 1996) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992)).

To succeed on a takings claim, Amex must show that the State's action affected a "legally cognizable property interest." *Prometheus Radio Project v. FCC*, 373 F.3d 372, 428 (3d Cir. 2004) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) and *Webb's*, 449 U.S. at 160-61 (1980)). "Relevant considerations include '[t]he economic impact of the regulation on the claimant and . . . the extent to which the regulation has interfered with distinct investment-backed expectations.'" *New Jersey v. United States*, 91 F.3d at 463 (quoting *Penn Cent.*, 438 U.S. at 124).

The character of the state action is also relevant: unlike "a physical invasion of land[,] . . . a public program adjusting the benefits and burdens of economic life to promote the common good . . . ordinarily will not be compensable." *Id.* (internal quotation marks and citation omitted). Thus, that a regulation "adversely affect[s] recognized economic values" is not enough to constitute a taking. *Id.* Even a regulation that prohibits the most beneficial use of property, or prevents an individual from operating an otherwise lawful business, does not necessarily violate the Takings Clause. *Penn Cent.*, 438 U.S. at 125-26.

We agree with the District Court that Amex failed to show a likelihood of success on the merits of its takings claim. Amex maintains that it has both a right to invest the

17

proceeds from the sale of TCs and a property interest in the income generated. Amex argues that the retroactive application of Chapter 25 constitutes a taking because it interferes with Amex's investment-backed expectation that TCs already sold would have an abandonment period of fifteen years, which would have allowed Amex to invest the proceeds for fifteen years unless the owner redeemed the check.[7] However, Amex's claim that Chapter 25 interferes with its investment-backed expectations cannot stand because Amex's TC business has long been subject to regulation by New Jersey. The Supreme Court has established that "'[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.'" *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 227 (1986) (quoting *FHA v. The Darlington, Inc.*, 358 U.S. 84, 91 (1958)). Since Chapter 25 is a subsequent amendment to achieve the legislative end of assuming custody of abandoned property, Amex has no ground to claim interference with its investment-backed expectations.

Lastly, the fact that Amex has a contractual right to invest TC funds does not necessarily render Chapter 25 an

---

[7] Contrary to Amex's contention, *E. Enterp. v. Apfel*, 524 U.S. 498 (1998), is distinguishable from this case. In *E. Enterp.*, the Supreme Court held that the Coal Industry Retiree Health Benefit Act was an unconstitutional taking because it imposed on the employer retroactive pension liability for retired miners. *Id.* at 532. But here, Chapter 25 does not impose any further liability on Amex. It only requires that issuers like Amex turn over property owned by the *travelers check owners* to State custody.

unconstitutional taking. The State has considerable authority to enact legislation, including "the power to affect contractual commitments between private parties." *See E. Enterp.*, 524 U.S. 498, 528 (1998). Amex's ability to utilize TC funds is constrained by the owner's ability to redeem a TC on demand and by the terms of the State's unclaimed property laws. *See Security Sav. Bank*, 263 U.S. at 286. In *Delaware v. New York*, the Supreme Court delineated the property right of debtors with regard to state escheat laws:

> Funds held by a debtor become subject to escheat because the debtor has no interest in the funds – precisely the opposite of having "a claim to the funds as an asset." We have recognized as much in cases upholding a State's power to escheat neglected bank deposits. Charters, bylaws, and contracts of deposit do not give a bank the right to retain abandoned deposits, and a law requiring the delivery of such deposits to the State affects no property interest belonging to the bank. [*Sec. Sav. Bank*, 263 U.S. at 285-86]; *Provident Institution for Sav. v. Malone*, 221 U.S. 660, 665-66 (1911). Thus, "deposits are *debtor obligations* of the bank," and a State may "protect the interests of depositors" as creditors by assuming custody over accounts "inactive so long as to be presumptively abandoned." [*Anderson Nat. Bank*, 321 U.S. at 241] (emphasis added). Such "disposition of abandoned property is a function of the state," a sovereign "exercise of a regulatory power" over property and the private legal obligations inherent in property.

19

[*Standard Oil Co. v. New Jersey*, 341 U.S. 428, 436 (1951)].

507 U.S. 490, 502 (1993). Thus, Amex, as debtor to TC owners, has no right to retain the funds once they are deemed abandoned under the State's unclaimed property laws. Accordingly, the District Court did not err in finding that Amex failed to show a reasonable probability of success on its Takings Clause claim.

## D. Commerce Clause

Under the Commerce Clause, Congress has the power to "regulate Commerce . . . among the several States." U.S. Const. Art. I, § 8, cl. 3. "This clause also has an implied requirement (often called the 'negative' or 'dormant' aspect of the clause) that the states not 'mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 261 (3d Cir. 2006) (citing *Granholm v. Heald*, 533 U.S. 460, 472 (2005)). Our inquiry as to whether a state law violates the dormant Commerce Clause is twofold: first, we determine whether heightened scrutiny applies, and, if not, then we determine whether the law is invalid under the *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), balancing test. *Cloverland-Green*, 462 F.3d at 261 (citation omitted). We apply heightened scrutiny when a law "discriminates against interstate commerce" in purpose or effect. *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994). Because Amex has not alleged that heightened scrutiny applies, we look to the *Pike* balancing test. Under this test, courts will uphold nondiscriminatory regulations that only incidentally affect interstate commerce unless "the burden

20

imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.

Amex contends that Chapter 25, if implemented, will violate the dormant Commerce Clause because its effects will be projected into other states. Specifically, Amex claims that it will be forced to choose between: (a) selling TCs in New Jersey at a marginal profit or at a loss; (b) not selling TCs in New Jersey; (c) charging a fee for selling TCs in New Jersey; or (d) charging a fee to sell TCs throughout the country so that it can maintain uniform conditions. If it chooses to charge a fee to sell TCs throughout the country, Amex argues, then Chapter 25 will have dictated commercial activity in other states.

Amex compares such a result to laws the Supreme Court struck down on dormant Commerce Clause grounds in *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 582 (1986) and *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336 (1989). In *Brown-Forman*, the Supreme Court found that New York had "project[ed] its legislation into [other States]" by requiring distillers to seek the approval of the New York State Liquor Authority before lowering prices in other states. 476 U.S. 583-84 (internal quotation marks and citation omitted) (second alteration in original). Similarly, in *Healy*, the Supreme Court struck down a Connecticut statute that "require[d] out-of-state shippers of beer to affirm that their posted prices for products sold to Connecticut wholesalers [were] . . . no higher than the prices at which those products are sold in [neighboring states.]" 491 U.S. at 326. The Court held both statutes to be unconstitutional because "States may not deprive businesses and consumers in other States of 'whatever competitive advantages they may possess based on the conditions of the

21

local market." *Healy*, 491 U.S. at 339 (quoting *Brown-Forman*, 476 U.S. at 580).

Unlike these statutes, Chapter 25 does not directly regulate travelers checks sold in other states or force Amex to conform its out-of-state practices to less favorable in-state conditions. Nothing prevents other states from regulating travelers checks differently from the way New Jersey has chosen to do in Chapter 25. And by Amex's own admission, the costs of compliance could be passed on to New Jersey travelers check customers or be absorbed by issuers like Amex.[8] Under the *Pike* balancing test, when the costs of a regulation may be born solely by those in the state enacting it, the burden imposed on interstate commerce is minimal, and not excessive in relation to the putative local benefits articulated by the State. *See United Haulers Ass'n, Inc. v.*

---

[8] Amex argues that requiring it to change its TC business so that it operates differently in New Jersey than it does in other jurisdictions (*e.g.*, charging a fee in New Jersey) would substantially burden interstate commerce based on the Supreme Court's decision in *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529-30 (1959). But the Supreme Court acknowledged that *Bibb* was an exceptional case because the state law obstructed the literal movement of goods between states by requiring trucks to alter their safety equipment upon entering Illinois. *Id.* at 529. The Court maintained that states have "great leeway in providing safety regulations for all vehicles—interstate as well as local[,]" but in that case, the burden on the interstate movement of trucks passed "the permissible limits even for safety regulations." *Id.* at 530. Amex has not shown that Chapter 25 imposes a similarly heavy burden for this to be considered an exceptional case.

*Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007) (holding when "the very people who voted for the laws" bear the costs attributable to those laws, the costs of the regulation do not fall outside the state). Therefore, Amex failed to show a reasonable probability of success on the merits of its Commerce Clause claim.

### E.  Remaining preliminary injunction factors

Because Amex was unable to show a likelihood of success on the merits of its claims, we need not address the remaining preliminary injunction factors, s*ee Crissman*, 239 F.3d at 364 (listing preliminary injunction factors), and the District Court's denial of Amex's motion for preliminary injunction must be affirmed. *See In re Arthur Treacher's Franchisee Litig.*, 689 F.2d at 1143.

### IV.  Conclusion

We hold that Amex failed to show a likelihood of success on the merits of its Due Process Clause, Contract Clause, Takings Clause, and Commerce Clause claims. Thus, the motion for preliminary injunction of Chapter 25 must be denied. For the foregoing reasons, we will affirm the order of the District Court.