NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1584-20

CHARLES KRAVITZ, DAWN
JOHANSON-KRAVITZ,
LITTLE HARRY'S LLC,
MARGARITA JOHNSON, JOHN
JOHNSON, TWO BEARS
PROPERTY MANAGEMENT,
ANDREW VAN HOOK, and UNION
LAKE ENTERPRISES, LLC,

      Plaintiffs-Appellants,

v.

PHILIP D. MURPHY, in his
official capacity as Governor of New
Jersey, GURBIR S. GREWAL,
in his official capacity as New Jersey
Attorney General, and JUDITH M.
PERSICHILLI, in her official
capacity as Commissioner of the
New Jersey Department of Health,

      Defendants-Respondents.

_____

| APPROVED FOR PUBLICATION |
| --- |
| July 20, 2021 |
| APPELLATE DIVISION |

Argued June 1, 2021 – Decided July 20, 2021

Before Judges Messano, Hoffman and Smith.

On appeal from Executive Order No. 128, pursuant to
a transfer from the Superior Court of New Jersey, Law
Division, Cumberland County, Docket No. L-0774-20.

Jared McClain (New Civil Liberties Alliance) of the Maryland bar, admitted pro hac vice, argued the cause for appellants (Zimolong, LLC, Jared McClain, and Harriet Hageman (New Civil Liberties Alliance) of the Wyoming, Colorado and Nebraska bars, admitted pro hac vice, attorneys; Jared McClain, Harriet Hageman, Kara Rollins and Walter S. Zimolong, on the briefs).

Stuart M. Feinblatt, Assistant Attorney General, argued the cause for respondents (Gurbir S. Grewal, Attorney General, attorney; Jeremy M. Feigenbaum, State Solicitor, Alec Schierenbeck, Deputy State Solicitor, and Melissa Raksa, Assistant Attorney General, of counsel; Stuart M. Feinblatt, of counsel and on the brief; Tim Sheehan, Deputy Attorney General, on the brief).

Joseph C. O'Keefe (Proskauer Rose LLP), Lindsey Olsen Collins (Proskauer Rose LLP) of the New York bar, admitted pro hac vice, and Michelle M. Ovanesian (Proskauer Rose LLP), of the California, Delaware and District of Columbia bars, admitted pro hac vice, attorneys for amici curiae Fair Share Housing Center, Lawyers' Committee for Civil Rights Under Law, Housing & Community Development Network of New Jersey, National Association for the Advancement of Colored People – New Jersey State Conference, and the New Jersey Latino Action Network (Joseph C. O'Keefe, Lindsey Olsen Collins and Michelle M. Ovanesian, on the brief).

The opinion of the court was delivered by

HOFFMAN, J.A.D.

Appellants – five individuals and three businesses – own or manage New Jersey properties leased to residential tenants. Appellants' tenants all paid security deposits of varying amounts in connection with their leases. As a

result of COVID-19, on April 24, 2020, Governor Philip D. Murphy issued Executive Order 128 (EO 128) that permitted New Jersey residential tenants to use their security deposits to pay rent. N.J. Exec. Order No. 128 (April 24, 2020).

Appellants argue that EO 128 exceeded the Governor's powers under the Emergency Health Powers Act, N.J.S.A. 26:13-1 to -31 (the EHPA), and the New Jersey Civil Defense and Disaster Control Act, N.J.S.A. App. A:9-30 to -63 (the Disaster Control Act); in addition, they contend EO 128 violated their rights under the contracts and due process clauses of the New Jersey Constitution.[1] For the reasons that follow, we conclude the Governor was authorized to enact EO 128 pursuant to emergency powers the Legislature delegated to the Governor under the Disaster Control Act. We further conclude that EO 128 does not violate appellants' rights under the New Jersey Constitution.

---

[1] After oral argument, pursuant to Rule 2:6-11(d), respondents brought to our attention that on June 4, 2021, Governor Murphy signed into law A5820, which terminates most of the Governor's COVID-19 executive orders, including EO 128, the order at issue in this appeal, effective July 4, 2021. The Governor simultaneously issued Executive Order 244 formally terminating the Public Health Emergency declared in Executive Order 103. According to respondents, "the expiration of EO 128 on July 4 will moot this appeal." Substantially for the reasons expressed by appellants in their June 17, 2021 letter brief, including the fact that "the terms of EO 128 explicitly keep the order's effects in place for at least six months after the expiration of EO 128," we decline to dismiss this appeal on mootness grounds.

Appellants Charles Kravitz and Dawn Johanson-Kravitz, residents of Mullica Hill, own and operate appellant Little Harry's LLC, which leases a residential property owned by the Kravitzes in Glassboro, near Rowan University (the Glassboro Property). On August 3, 2019, the Kravitzes rented the Glassboro Property to four Rowan University students (the Rowan Tenants), pursuant to a residential lease agreement. The Rowan Tenants agreed to lease the Glassboro Property from August 15, 2019 through June 1, 2020, for $2,000 per month in rent; in their lease, the parties agreed that the Rowan Tenants would pay a security deposit of $2,000, which the Kravitzes would "hold . . . in an interest bearing account." The lease specified that the Kravitzes could "make deductions from the [s]ecurity [d]eposit" to cover ten enumerated costs, and that the Rowan Tenants "may not use the [s]ecurity [d]eposit as payment for [r]ent"; in addition, the Kravitzes would return the security deposit "less any proper deductions" after termination of the lease.

Appellants Margarita Johnson and John Johnson, residents of Vineland, own and operate Two Bears Property Management and serve as co-trustees of the Johnson Trust, which owns a residential duplex in Vineland (the Vineland Property). The Johnson Trust agreed to lease the Vineland Property to a tenant

4

from August 1, 2017, through July 31, 2019, for $820 per month, pursuant to a lease that required the tenant to pay a security deposit of $1,230.

Appellant Andrew Van Hook, a Millville resident, serves as the managing member of Union Lake Enterprises, LLC (Union Lake), which owns a residential property in Millville (the Millville Property). Union Lake agreed to rent the Millville Property to a tenant, pursuant to a lease that required the tenant to pay rent of $1,450 per month from August 1, 2018, to June 30, 2020, with a security deposit of $2,175; later, the parties agreed to extend the lease to June 30, 2021. The lease further provided that, within thirty days of the termination of the lease, Union Lake "shall return the [s]ecurity [d]eposit . . . less any charges expended by [Union Lake] for damages . . . resulting from the [t]enant's occupancy." In addition, the lease stated that the tenant could not use the security deposit "for the payment of rent without the written consent of the [l]andlord."

New Jersey's Economic Response to COVID-19

In response to the economic and public health crises caused by COVID-19, the State took multiple steps to address the risk of housing insecurity across the State. For homeowners, in March 2020, the Governor announced a statewide residential mortgage relief program, in which over 175 financial institutions agreed to provide a ninety-day grace period for mortgage

payments, waive mortgage-related late fees, and start no new foreclosures for sixty days. See N.J. Dep't of Banking & Ins., COVID-19 & Residential Mortgage Relief, https://www.state.nj.us/dobi/covid/mortgagerelief.html (last visited July 14, 2021). For landlords, the Governor announced the Small Landlord Emergency Grant Program (SLEG), a twenty-five-million-dollar program established to reimburse small residential property owners for lost rent revenue due to COVID-19 between April and July 2020. See N.J. Housing & Mortgage Finance Agency, "Small Landlord Emergency Grant Program (SLEG) – Round 1," https://www.state.nj.us/dca/hmfa /covid19/sleground1 (last visited July 14, 2021). SLEG

> provides financial support for small rental property owners (and, indirectly, to renters) who are struggling due to the COVID-19 emergency in the State of New Jersey. The Program will reimburse small landlords for rent payments that were missed or reduced in April, May, June, and/or July 2020. Only properties with low-to-moderate rent levels are eligible.
>
> [Ibid.]

What constitutes low to moderate rent levels depends upon the rental property's county and number of bedrooms. Ibid. Glassboro is in Gloucester County; Vineland and Millville are in Cumberland County. The record does not indicate the number of units owned by each appellant or the number of bedrooms in the properties under discussion here. On March 22, 2021, the

6

New Jersey Department of Community Affairs announced Phase II of the rental relief fund for renters unable to make rent payments due to COVID-19. Ibid. These rental relief payments will be made directly to landlords.[2]

For tenants, the Governor issued two Executive Orders to address the challenges many renters faced in making rent payments, given the sharp loss of jobs and income caused by COVID-19. First, on March 19, 2020, the Governor issued Executive Order 106 (EO 106), which placed a temporary emergency moratorium on evictions, with the moratorium expiring two months after the ongoing public-health emergency ends. N.J. Exec. Order No. 106 (March 19, 2020). Governor Murphy explained that "many New Jerseyans are or will be experiencing substantial loss of income as a result of business closures, reductions in hours, or layoffs related to COVID-19, impeding their ability to keep current on rent and mortgage payments . . . ." Ibid. He further stated that the "removal of residents pursuant to evictions or foreclosure proceedings can increase the risk to those residents of contracting COVID-19, which in turn increases the risks to the rest of society and endangers public health . . . ." Ibid.

---

[2] N.J. Dep't of Cmty. Affairs, COVID-19 Emergency Rental Assistance Program, https://njdca.onlinepha.com (last visited July 14, 2021).

A-1584-20

Importantly, the Governor qualified the reach of EO 106 in two ways. The order first made clear that it "does not affect any schedule of rent that is due." Ibid. In addition, although the EO 106 temporarily paused actual evictions, "eviction and foreclosure proceedings may be initiated or continued during the time this [o]rder is in effect . . . ." Ibid. State courts resumed processing landlord/tenant matters on June 15, 2020. See N.J. Supreme Court, Notice & Order – COVID-19 – Fourth Omnibus Order ¶ 4 (June 11, 2020), https://njcourts.gov/notices/2020/n200612a.pdf.

With the crisis worsening in New Jersey, on April 24, 2020, the Governor issued EO 128, the order under review, to assist renters, who continued to struggle, despite EO 106. Explaining the need for this measure, the Governor stated that "tenants may be suffering from one or more financial hardships that are caused by or related to the COVID-19 pandemic, including but not limited to a substantial loss of or drop in income, and additional expenses such as those relating to necessary health care . . . ." Ibid. The Governor noted that these tenants, while largely protected from removal, would still be subject to eviction proceedings, such that there was an "increased risk" of mass evictions when EO 106's temporary moratorium lapses. Ibid. In addition, the Governor explained that renters "may face other consequences from a late payment of rent, including interest and late fees,

which they may be unable to satisfy in light of their substantial loss of income, as well as negative credit reports that may affect their ability to find housing options in the future . . . ." Ibid.

The Governor then identified a temporary way to help tenants continue to make rent payments owed to landlords. As he explained, under New Jersey law "a security deposit and the accumulated interest and earnings on the investment of such deposit remain the property of the tenant . . . ." Ibid. (citing N.J.S.A. 46:8-19). The Governor concluded that "enabling individuals to pay portions of their rent with the security deposit they own will allow those individuals to mitigate the consequences regarding evictions and accumulation of interest and late fees upon termination of [EO 106] . . . ." Ibid. The Governor's order thus allowed New Jersey tenants to use "a security deposit governed by the provisions of N.J.S.A. 46:8-19 et seq., as well as the tenant's portion of the interest and/or earnings accumulated thereon . . . towards rent payments due . . . ." Ibid.

In an effort to minimize any adverse impact upon landlords resulting from this temporary change, the Governor qualified EO 128 in three important ways. First, EO 128 states that, where a tenant applies a security deposit to unpaid rent, "[t]he landlord may recoup from the tenant any monies the landlord expended that would have been reimbursable by the security deposit

9

and interest or earnings thereon, at the time that such reimbursement from the deposit and interest or earnings thereon would have taken place . . . ." Restated, the landlord remains legally entitled to precisely the same money from the tenant as before. Second, EO 128 established that tenants "shall be obligated to replenish the security deposit in full" if they renew the lease. Ibid. And third, EO 128 was time-limited to address the need for continued rent payments during and right after the public-health emergency; it only applies to payments "due to become due from the tenant during the Public Health Emergency . . . or up to [sixty] days after the Public Health Emergency terminates." Ibid.

In June 2020, appellants filed an action in New Jersey federal district court seeking declaratory and injunctive relief regarding EO 128. Johnson v. Murphy (Johnson), No. 20-cv-6750-NLH, 2021 WL 1085744 (D.N.J. Mar. 22, 2021). Appellants alleged that EO 128 violated the federal Contracts Clause, federal substantive and procedural due process, federal equal protection, and the federal Privileges and Immunities Clause. Id. at *12-13. Appellants also asserted causes of action under state law.[3]

---

[3] After respondents declined to waive sovereign immunity over the state-law claims, appellants dismissed those claims without prejudice; on December 15, 2020, appellants refiled the claims in the Law Division. Because we maintain exclusive jurisdiction to hear challenges to Executive Orders, on January 26,

A-1584-20

On March 22, 2021, the district court rejected all of appellants' claims, granting the State's Rule 12(b)(6)[4] motion to dismiss and dismissing appellants' complaint in its entirety. As part of its ruling on the State's motion, the court set forth the following facts surrounding the issuance of EO 128:

> As of today, over twenty-nine million Americans are known to have contracted COVID-19 and five hundred thirty-six thousand seven hundred thirty-four Americans have died from the disease. These numbers are steadily increasing, and they have increased significantly since the filing of this lawsuit on June 2, 2020. New Jersey alone, as of today, has recorded more than seven hundred fifty-eight thousand confirmed cases and twenty-one thousand five hundred eighty-eight confirmed deaths. . . .
>
>    . . . .
>
> In response to the COVID-19 pandemic, Governor Murphy declared a public health emergency and state of emergency on March 9, 2020. The stated purpose of Executive Order 103 was "to protect the health, safety and welfare of the people of the State of New Jersey." N.J. Exec. Order 103. Governor Murphy explained he was exercising certain emergency powers of the Governor provided under "the Constitution and statutes of the State of New Jersey . . . ."

_____

2021, the Law Division signed a consent order transferring the case to us. On February 18, 2021, we ordered the appeal accelerated.

[4] Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint for "failure to state a claim upon which relief can be granted."

Following Executive Order 103, Governor Murphy issued several executive orders with the purpose of attempting to monitor, plan for and mitigate the spread of COVID-19. To reduce the spread of COVID-19, on March 16, 2020, Governor Murphy ordered gatherings in New Jersey limited to no more than [fifty] persons and mandated the closure of schools, casinos, racetracks, gyms and fitness centers, entertainment centers, bars, and restaurants (except for takeout and delivery). N.J. Exec. Order 104. On March 15, 2020, the national Centers for Disease Control and Prevention ("CDC") recommended that gatherings of [fifty] or more people should be cancelled or at least postponed throughout the United States for the following eight weeks. Governor Murphy implemented that recommendation in Executive Order 104. Governor Murphy further explained that the "CDC has advised that COVID-19 spreads most frequently through person-to-person contact when individuals are within six feet or less of one another" and that for this reason, the CDC has recommended individuals through the United State[s] to practice social distancing. Governor Murphy ordered that any violator of Executive 104 may be subjected to criminal penalties.

Five days later on March 21, 2020, Governor Murphy issued Executive Order 107, which mandated the closure of non-essential businesses to the public and required that New Jersey residents, with limited exceptions, remain at their residence. N.J. Exec. Order 107. In doing so, Governor Murphy explained that "to mitigate community spread of COVID-19, it is necessary to limit the unnecessary movement of individuals in and around their communities and person-to-person interactions in accordance with CDC and DOH guidance." N.J. Exec. Order 107. Governor Murphy ordered that any violator of Executive 107 may be subjected to criminal penalties.

A-1584-20

. . . .

> In April 2020, New Jersey was one of the eight
> jurisdictions accounting for two-thirds of COVID-19
> cases identified in the United States and one of the
> three jurisdictions accounting for approximately half
> of all deaths related to COVID-19.
>
> [Id. 2021 WL 1085744 at *1-3.]

Regarding the Glassboro Property, on June 1, 2020, three of the Rowan Tenants submitted letters requesting to use their portions of the security deposit ($500 each) to pay rent. After the Rowan Tenants vacated the property at the conclusion of their lease, the Kravitzes claim they discovered $1,854.94 in damage. As for the Vineland Property, the tenant made only one partial rent payment after April 2020; as of April 1, 2021, the tenant owed $13,999.50. Regarding the Millville Property, the record does not indicate whether the tenant used the security deposit to pay rent or caused damage to the leased premises.

In their brief, appellants present the following points of argument:

I. Governor Murphy Exceeded His Emergency Statutory Powers.

II. EO-128 Violates the Separation of Powers.

III. EO-128 Violates the Contracts Clause.

IV. EO-128 Violates Due Process.

After carefully considering each argument, we conclude that none of them warrant setting aside EO-128. We analyze each argument in turn.

I.

Appellants argue that EO 128 exceeds the Governor's emergency powers. We reject this argument, finding that EO 128 constitutes a valid use of the Governor's emergency powers.

The Governor is authorized to issue executive orders, "a well-accepted tool of gubernatorial action." Perth Amboy Bd. of Educ. v. Christie, 413 N.J. Super. 590, 598-99 (App. Div. 2010). An executive order is only valid if authorized by statute. Worthington v. Fauver, 88 N.J. 183, 197-98 (1982).

The Security Deposit Act (SDA) provides certain safeguards for residential tenants' security deposits. For example, a security deposit remains the property of the tenant, "shall not be mingled with the personal property of the [landlord]," and shall be deposited in an interest bearing account. N.J.S.A. 46:8-19. The SDA also provides instruction as to: what happens to the tenant's security deposit when the property is conveyed to another person, N.J.S.A. 46:8-20 and -21; when and how the security deposit should be returned to the tenant minus any charges, N.J.S.A. 46:8-21.1; the amount that a landlord may demand for a security deposit, N.J.S.A. 46:8-21.2; and that landlords and tenants may not waive any provision of the law, N.J.S.A. 46:8-

24.     The landlord must provide the tenant with itemized deductions establishing what was deducted from the security deposit.  N.J.S.A. 46:8-21.1.  The SDA provides double recovery to tenants when a landlord wrongfully withholds a security deposit.  Ibid.; MD Assocs. v. Alvarado, 302 N.J. Super. 583, 586 (App. Div. 1997).  The SDA permits a landlord to deduct from the security deposit for unpaid rent.  Truesdell v. Carr, 351 N.J. Super. 317, 321 (Law Div. 2002).  In fact,

> [t]he purpose of a security deposit is to afford protection to the landlord in the event that the tenant defaults in the payment of rent, causes damage to the premises, or breaches any covenants in the lease.  Where the lease provides, . . . that the landlord shall retain the deposit until the end of the term of the lease, he may not be compelled to apply it to any earlier default.  If this were not the case the landlord would be without protection for the remainder of the term.
>
> [Brownstone Arms v. Asher, 121 N.J. Super. 401, 403-04 (Cnty. D. Ct. 1972) (citations omitted).]

Appellants argue that the EHPA and the Disaster Control Act, as cited by the Governor in the executive order, do not authorize the actions he took regarding rental security deposits in EO 128.[5]  We address each statute in turn.

---

[5]  EO 128 also cited N.J.S.A. 38A:3-6.1 (authorizing the Governor to order to active duty the New Jersey National Guard), and N.J.S.A. 38A:2-4

A.  Emergency Health Powers Act

Appellants argue that the EHPA specifically lists the powers given to the Governor and the Commissioner of Health, with no other powers authorized. According to appellants, authorizing tenants to use security deposits to pay rent is not a power envisioned by the EHPA and is not related to the other powers given by that statute, which pertain to addressing consequences of a public health emergency.  Significantly, respondents' brief advances no arguments pertaining to the EHPA.

The EHPA grants the Governor authority to "declare a public health emergency."  N.J.S.A. 26:13-3(a).  The statute provides in pertinent part:

> a. The Governor, in consultation with the commissioner [of health] and the Director of the State Office of Emergency Management, may declare a public health emergency.  In declaring a public health emergency, the Governor shall issue an order that specifies:
> 1) the nature of the public health emergency;
>
> 2) the geographic area subject to the declaration;
>
> 3) the conditions that have brought about the public health emergency to the extent known; and

_____

(authorizing the Governor to "order to active duty all or any part of the militia that he may deem necessary").  Since these statutes clearly do not apply to the actions the Governor took in EO 128, the parties' briefs did not address either statute.

A-1584-20

4) the expected duration of the state of public health emergency, if less than [thirty] days. Such order may also prescribe necessary actions or countermeasures to protect the public's health.

[N.J.S.A. 26:13-3.]

Although the Governor is charged with declaring the state of emergency, the EPHA primarily empowers the Commissioner of Health to protect the wellbeing of New Jersey citizens. For example, under the EHPA, the Commissioner may: investigate any incident or imminent threat of a human disease or health condition; identify exposed individuals; establish a registry of health care workers; provide for the safe disposition of human remains; evacuate facilities; dispose of infectious waste; and control the supply and distribution of vaccines. N.J.S.A. 26:13-4 to 11. In addition, the Commissioner may vaccinate, decontaminate, and provide medical treatment to address the public health emergency. N.J.S.A. 26:13-14.

We agree with appellants that the EHPA addresses public health emergencies and that most powers authorized by that statute are directed toward the Commissioner of Health, not the Governor. According to the plain meaning of the EHPA, the executive branch may take certain acts to address a public health emergency and to "prescribe necessary actions or countermeasures to protect the public's health." N.J.S.A. 26:13-3. By

permitting tenants to use their security deposits to pay rent, EO 128 does not directly protect the community's health, but instead creates an economic safeguard. We therefore conclude that the EHPA does not provide authority for the Governor's issuance EO 128 because it was not directly related to the public health.

B. Disaster Control Act

Appellants argue that EO 128 is not authorized by the Disaster Control Act, asserting that the statute imposes definite limits on the Governor's authority to take actions in a public emergency, and the actions taken in EO 128 are not within those limits. We reject this argument.

The Disaster Control Act authorizes the Governor

> to render to the Government of the United States, in the present crisis, and to provide for the public safety, any assistance within the power of the State, and to that end he is authorized to organize and employ any and all resources within the State, whether of men, properties or instrumentalities, and to exercise any and all power convenient or necessary in his judgment to render                such                assistance.
>
> [N.J.S.A. App. A:9-30.]

A disaster is defined under the Disaster Control Act as

> any unusual incident resulting from natural or unnatural causes which endangers the health, safety or resources of the residents of one or more municipalities of the State, and which is or may become too large in scope or unusual in type to be

handled in its entirety by regular municipal operating services.

[N.J.S.A. App. A:9-33.1(1).]

The purpose of the Disaster Control Act

is to provide for the health, safety and welfare of the people of the State of New Jersey and to aid in the prevention of damage to and the destruction of property during any emergency as herein defined by prescribing a course of conduct for the civilian population of this State during such emergency and by centralizing control of all civilian activities having to do with such emergency under the Governor and for that purpose to give to the Governor control over such resources of the State Government and of each and every political subdivision thereof as may be necessary to cope with any condition that shall arise out of such emergency and to invest the Governor with all other power convenient or necessary to effectuate                such                purpose.

[N.J.S.A. App. A:9-33.]

Pursuant to the Disaster Control Act,

[t]he Governor is authorized to utilize and employ all the available resources of the State Government and of each and every political subdivision of this State, whether of men, properties or instrumentalities, and to commandeer and utilize any personal services and any privately owned property necessary to avoid or protect against any emergency subject to the future payment of the reasonable value of such services and privately owned property as hereinafter in this act provided.

[N.J.S.A. App. A:9-34.]

Originally, under the Disaster Control Act, the Legislature only gave the Governor powers to address war emergencies. Worthington v. Fauver, 88 N.J. 183, 200 (1982); however, the Legislature eventually expanded the Governor's powers to address any unusual incident which endangers the public health, safety, or welfare. Ibid. The Governor is also not required to wait for a catastrophe to occur before taking action. Ibid. However, the Governor's power under the Disaster Control Act

> is not without limit. While a situation of impending disaster may sometimes fall within the statutory definition of "emergency," the statute does not grant the executive the power to label any situation an "emergency" merely because there is a chance that some kind of disruption will occur in the foreseeable future. There must be a substantial likelihood of occurrence within the immediate future.
>
> [Id. at 196-97.]

Notwithstanding this limitation, "the Governor's power under the Disaster Control Act must be liberally construed to accomplish its crucial legislative purpose." Id. at 199.

N.J.S.A. App. A:9-45 provides:

> In order to accomplish the purposes of this act, the Governor is empowered to make such orders, rules and regulations as may be necessary adequately to meet the various problems presented by any emergency and from time to time to amend or rescind such orders, rules and regulations, including among others the following subjects: . . . .

20

N.J.S.A. App. A:9-45 then lists some of the subjects the Governor may address in an emergency, including: blackouts; air raid warnings; recruitment of volunteers including air raid wardens, police and firemen; designation of vehicles and persons who can move during an air raid or any emergency; conduct of civilian population during an emergency; air raid protocol for schools; counteracting threatened sabotage; and evacuating residents.

The last two sections of N.J.S.A. App. A:9-45 give the Governor powers:

> i. On any matter that may be necessary to protect the health, safety and welfare of the people or that will aid in the prevention of loss to and destruction of property.
>
> j.  Such other matters whatsoever as are or may become necessary in the fair, impartial, stringent and comprehensive administration of this act.

Appellants correctly cite Worthington, 88 N.J. at 187-98, and Cnty. of Gloucester v. State, 132 N.J. 141, 146-52 (1993), for the proposition that in determining whether the actions were authorized by the Disaster Control Act, the court must first determine whether the governor's action is "rationally related" to the legislative goal of protecting the public, and second, whether it is "closely tailored to the magnitude of the emergency." Appellants argue that EO 128 fails both prongs in that it is neither rationally related to protecting the

21

public from damage related to COVID-19, nor is it closely tailored to the magnitude of the emergency. We disagree, finding both prongs satisfied.

### 1. Rationally related (prong one)

Appellants contend that EO 128 is not rationally related to the legislative goal of protecting the public from the damage created by COVID-19 because it does not protect residential tenants from eviction, given that EO 106 already accomplished that goal.

According to appellants, unlike EO 106, which protects New Jersey residential tenants from evictions until two months after the end of the public health emergency, EO 128 protects tenants from challenges in finding housing rentals that might arise after the end of the pandemic. Appellants argue that EO 128, therefore, is not rationally related to protecting the public from damage caused by the public health emergency because it addresses future consequences that might arise for New Jersey tenants after the end of the pandemic, such as interest and late fees and negative credit reports. In particular, appellants point to the highlighted language in the following two paragraphs of EO 128:

> [F]amilies struggling to pay rent due to financial hardship during the ongoing Public Health Emergency and the State of Emergency <u>may also remain at increased risk for eviction upon the termination of [EO 106] which under the terms of the Order must happen</u>

> no later than two months after the end of the Public
> Health Emergency or State of Emergency . . . .
>
> WHEREAS, in addition to eviction proceedings
> being initiated and the continued risk of eviction upon
> termination of the Order, individuals may face other
> consequences from a late payment of rent, including
> interest and late fees, which they may be unable to
> satisfy in light of their substantial loss of income, as
> well as negative credit reports that may affect their
> ability to find housing options in the future . . . .
>
> [(emphasis added)].

Based on this language, appellants contend that EO 128 is intended to protect tenants from the continued risk of eviction after the end of the pandemic; however, the Disaster Control Act is meant to "provide for the health, safety and welfare of the people of the State of New Jersey and to aid in the prevention of damage to and the destruction of property during any emergency." N.J.S.A. App. A:9-33 (emphasis added). In addition, by removing any incentive for tenants to maintain their rental properties, appellants contend that EO 128 will actually make "damage to and the destruction of property" more likely, not less.

Respondents counter that EO 128 is, in fact, rationally related to the public emergency because COVID-19 has created a fiscal and economic crisis, in addition to a public health emergency. In support, respondents cite N.J. Republican State Comm. v. Murphy (NJRSC), 243 N.J. 574, 580-81 (2020)

23

where the Court found, "[l]aypeople, scientists, and legal scholars alike would agree that COVID-19 is a true disaster with widespread consequences. The pandemic has caused a health emergency, a broad based economic one that has devastated many individuals and families, and a fiscal crisis for the State."

The Court in NJRSC further expressed that:

> The virus has also triggered staggering economic consequences for the nation and the State. As states and cities imposed restrictions to slow the spread of the virus, business closures led to mass layoffs and furloughs. Gross Domestic Product fell 32.9% on an annualized basis during the second quarter of this year, marking one of the steepest declines in the country's history. The nation's unemployment rate rose from 3.5% in February 2020 to 14.7% in mid-April. In May, the number of people seeking unemployment benefits peaked at nearly 25 million nationwide. By June, New Jersey's unemployment rate had reached 16.6%. Nearly 1.4 million New Jersey residents filed unemployment claims between mid-March and mid-July. Even as workers returned to their jobs, the number of continuing claims remained close to 500,000 in mid-July.

> [Id. at 583-84.]

Thus, respondents argue that EO 128 is rationally related to the COVID-19 pandemic, inasmuch as it addresses the State's fiscal and economic emergencies. Also, respondents point out that EO 128 addresses the many tenants who experienced a loss of income resulting in an impaired ability to pay for health care.

In support of their position that COVID-19 has caused an economic crisis, respondents cite federal cases, including Bauer v. Elrich, 463 F. Supp. 3d 606, 614 (D. Md. 2020) ("The COVID-19 pandemic is a genuine public health crisis that poses dire health risks" and has "brought on a severe economic crisis."), and Washington v. DeVos, 466 F. Supp. 3d 1151, 1171 (E.D. Wash. 2020) ("[T]he COVID-19 pandemic has had devastating economic consequences.").

Because of the serious economic crisis affecting New Jersey, respondents argue that EO 128 is rationally related to the COVID-19 pandemic by permitting tenants to use their security deposits to pay rent, thereby contributing additional funds to the tenants who lost income and suffered corresponding hardship in paying for their household expenses, including medical care.

In determining whether a statute is rationally related, a court's inquiry is limited to whether the law "rationally furthers any legitimate state objective." Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff, 669 F.3d 359, 367 (3d Cir. 2012) (quoting Malmed v. Thornburgh, 621 F.2d 565, 569 (3d Cir. 1980)). "[T]he rationality standard is a low threshold; to be valid, the Ordinance need only 'find some footing in the realities of the subject addressed by the legislation.'" Greater Houston Small Taxicab Co. Owners Ass'n v. City

25

of Hous., 660 F.3d 235, 240 (5th Cir. 2011) (quoting Heller v. Doe, 509 U.S. 312, 321 (1993)).    A statute will be upheld if it "reasonably relates to a legitimate legislative purpose and is not arbitrary or discriminatory." Greenberg v. Kimmelman, 99 N.J. 552, 563 (1985) (citing Nebbia v. N.Y., 291 U.S. 502, 537 (1934)).

Applying this relatively low threshold standard, EO 128 clearly bears a rational relationship to the health and economic crises created by COVID-19. EO 128 permits tenants to use security deposits to pay rent so as to permit access to additional funds to pay for health care during the pandemic.  Also, it seeks to prevent evictions for nonpayment of rent that might occur after the pandemic and could create additional homelessness.   Despite appellants' argument that EO 106 was intended to prevent homelessness, EO 128 also addresses that concern, albeit, using a different strategy.  Thus, we agree with respondents that EO 128 meets the first part of the Supreme Court's test for a valid executive order because it is rationally related to the emergency.

### 2.  Closely tailored (prong two)

Appellants next argue that EO 128 does not meet the second part of the New Jersey Supreme Court's test, contending that it is not "closely tailored" to the emergency.  Appellants assert that increasing the rights of tenants, while simultaneously decreasing the rights of landlords, amounts to favoring the

economic situation of one group of New Jersey citizens at the expense of another.

To bolster their argument that EO 128 is not closely tailored to meet the needs of the public emergency, appellants cite N.J.S.A. App. A:9-45. As noted, that statute lists ten subjects that may be addressed by executive orders, with most relating to actions the Governor might take during wartime, including black outs and air raid warnings. We are not persuaded by this argument since N.J.S.A. App. A:9-45(i) also provides a more comprehensive authorization to the Governor to issue executive orders "[o]n any matter that may be necessary to protect the health, safety and welfare of the people or that will aid in the prevention of loss to and destruction of property."

In considering the meaning of N.J.S.A. App. A:9-45(i), appellants cite two canons of statutory construction, ejusdem generis (of the same kind) and noscitur a sociis (words are interpreted based on the company they keep). For example,

> [W]hen general words follow specific words in a statutory enumeration, the general words are construed to embrace only the objects similar in nature to those objects enumerated by the preceding specific words. This technique saves the legislature from spelling out in advance every contingency in which the statute could apply.
>
> [State v. Hoffman, 149 N.J. 564, 584 (1997) (quoting Hovbilt, Inc. v. Twp. of Howell, 263 N.J. Super. 567,

571 (App. Div. 1993)).]

Also, in <u>Germann v. Matriss</u>, 55 N.J. 193, 220-21 (1970) (citations omitted), the Court explained:

> It is an ancient maxim of statutory construction that the meaning of words may be indicated or controlled by those with which they are associated. . . . The rule is not absolute, but it does serve as a helpful guide in ascertaining the intended scope of associated words or phrases in a statute where a particular word is followed by more general words, and the legislative purpose is unclear in such situations.

Appellants argue that the first eight subdivisions of N.J.S.A. App. A:9-45 describe very specific steps the Governor may take in an emergency; therefore, the court should interpret the more comprehensive power given to the Governor in N.J.S.A. App. A:9-45(i) (to address "any matter that may be necessary to protect the health, safety and welfare of the people or that will aid in the prevention of loss to and destruction of property") as limited to actions directly responding to dangers created by the emergency. Appellants contend that N.J.S.A. App. A:9-45(i) does not authorize the Governor to act on "any" matter that might protect the health, safety, and welfare of a discrete portion of the citizenry, without regard to the degree of connection between that matter and the danger created by the declared emergency.

Appellants further argue that the appropriateness of reading a limitation into the scope of N.J.S.A. App. A:9-45(i) is reinforced by N.J.S.A. App. A:9-

28

45(j), which gives the Governor authority to address "[s]uch other matters whatsoever as are or may become necessary in the fair, impartial, stringent and comprehensive administration of this act." Appellants contend that EO 128 violates the "fair" and "impartial" requirements by altering statutory law and private contracts to increase tenants' rights at the expense of landlords' rights.

Respondents counter that the list in N.J.S.A. App. A:9-45 is not comprehensive, but instead explicitly permits additional gubernatorial acts because of the following language: "[i]n order to accomplish the purposes of this act, the Governor is empowered to make such orders, rules and regulations as may be necessary adequately to meet the various problems presented by any emergency . . . , including among others the following subjects . . . ." N.J.S.A. App. A:9-45 (emphasis added). Also, the more general authorization in N.J.S.A. App. A:9-45(i) is meant to permit the Governor to take any act in the public welfare, so long as it is rationally related and closely tailored to the emergency.

Respondents further assert that EO 128 is closely tailored to the emergency because it "directly targets tenants' inability to pay rent without significant collateral consequences" and security deposits are the property of tenants, pursuant to N.J.S.A. 46:8-19. Moreover, respondents point out that EO 128 does not relieve the tenant of the responsibilities to pay rent or to

29

compensate the landlord for damage to property. Rather, landlords may obtain a judgment against a tenant for damages, just as they could have done previously, and in the real world, tenants often use their security deposits in place of their final rent payment. See Elmsford Apartment Assocs., LLC v. Cuomo, 469 F. Supp. 3d 148, 171 (S.D.N.Y. 2020) ("The whole scheme is no different than what actually happens in the real world, where tenants routinely forfeit their security deposit by allowing it to 'cover the last month's rent' on a lease."). Respondents also point out that EO 128 expires two months after the end of the pandemic, making it closely tailored to the COVID-19 emergency.

Regarding fairness, respondents contend that EO 128 represents one of many measures taken by the State to help individuals in the pandemic. Some of those measures assist landlords, including mortgage forbearance[6] and the SLEG.

In their reply brief, appellants state they do not qualify for the SLEG, because, apparently, they own less than three rental units. Also, appellants contend that EO 128 does not require tenants to replenish their security deposits, even after the pandemic ends. This argument lacks merit as the

---

[6] On March 28, 2020, the Governor announced that more than forty banks, credit unions, and servicers had committed to providing mortgage forbearance for New Jersey homeowners. N.J. Dep't of Banking & Ins., COVID-19 and Residential Mortgage Relief, https://www.state.nj.us/dobi/covid /mortgagerelief.html (last visited July 14, 2021).

A-1584-20

executive order does, in fact, require tenants to replenish their security deposits six months after the conclusion of the pandemic, or when renewing their lease, whichever is later. N.J. Exec. Order No. 128.

We conclude that EO 128 meets the Court's test for being closely tailored to meet the needs of the public health and economic emergency because: it gives tenants an opportunity to pay rent using their own funds held by landlords as security deposits; it does not hinder landlords' ability to obtain judgments for unpaid rent or damages; and it is time limited, inasmuch as it terminates two months after the end of the pandemic. Moreover, it is one of many measures meant to aid both landlords and tenants to financially survive the pandemic.

II.

Appellants argue that EO 128 violates the separation of powers between the three branches of government. This argument lacks merit.

Article III, Paragraph 1 of the New Jersey Constitution provides that "[t]he powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution."

31

"[T]he purpose of the separation of powers is to create a system of checks and balances among the three branches of government." State v. Bond, 365 N.J. Super. 430, 441 (App. Div. 2003). However, it is not intended "to create an absolute division of powers among the three branches of government, thereby preventing cooperative action among them." Ibid.

"[W]hen the Governor is acting consistently with express or implied authority from the Legislature, his or her action should be given the widest latitude of judicial interpretation, and the burden of persuasion . . . rest[s] heavily upon any who might attack it." Perth Amboy, 413 N.J. Super. at 601 (citations and internal quotation marks omitted). "Only when the challenged action impairs 'the essential integrity' of another branch will a court step in to enforce the constitutional boundaries." Bullet Hole, Inc. v. Dunbar, 335 N.J. Super. 562, 574 (App. Div. 2000) (quoting Cupano v. Gluck, 133 N.J. 225, 233 (1993)).

The sharing of constitutional power among the three branches of government ordinarily will be upheld. Commc'ns Workers of Am. v. Christie, 413 N.J. Super. 229, 257 (App. Div. 2010). "That is particularly true in situations where . . . the executive order flows out of the Governor's legislatively-delegated emergency powers to act on behalf of the safety and welfare of the people of New Jersey under the Disaster Control Act . . . ." Id.

A-1584-20

at 259.  Executive orders are generally upheld, even when they are challenged on separation of power grounds.  Ibid.  In reviewing an executive order, courts should give the executive action "the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it."  Worthington, 88 N.J. at 208 (citation omitted).

Appellants argue that EO 128 violates the New Jersey Constitution's fundamental separation of powers requirements by usurping the Legislature's lawmaking powers.  According to appellants, only the Legislature may make or suspend laws.  In fact, appellants argue that the Constitution only permits laws to be suspended in the context of habeas corpus:  "The privilege of the writ of habeas corpus shall not be suspended, unless in case of rebellion or invasion the public safety may require it."  N.J. Const. art. I, ¶ 14.  Appellants argue that this explicit exception of habeas corpus means that the Governor possesses no implicit constitutional authority to suspend other laws.

Appellants further argue that EO 128 directly undermines the SDA, which authorizes landlords to take a security deposit from a tenant and hold it until the end of the lease.  Moreover, EO 128 creates new criminal sanctions, a purely legislative function.  Appellants contend that EO 128 thus violates the Constitution's separation of powers requirements.

33

In a related argument, appellants contend the Disaster Control Act would violate the nondelegation doctrine if interpreted to authorize EO 128. The nondelegation doctrine provides that the Legislature may only delegate its power to legislate under very limited circumstances. In Roe v. Kervick, 42 N.J. 191, 232 (1964), the Court stated that the executive cannot be given "unbridled" powers that constitute an "abdication of the duty of the Legislature . . . ." Instead, a statute that confers on the executive the power to legislate "must impose basic standards, guidelines and a reasonably definite policy to be followed in its administration." Id. at 232. Here, appellants argue that if the Disaster Control Act authorizes EO 128, this would, in effect, empower the Governor to take virtually any action to address the COVID-19 pandemic, and essentially this would mean that no standards exist to limit the Governor's executive orders. Rather, appellants contend that the Disaster Control Act explicitly requires the Governor to focus solely on public health, safety, and welfare at the time of the emergency, and bars adoption of measures unrelated to problems directly created by the pandemic.

Respondents counter this argument by citing NJRSC, 243 N.J. at 580-81, where the Court recognized that the COVID-19 pandemic resulted in an economic crisis in addition to a public health emergency; for this reason, they assert that EO 128 is authorized by the Disaster Control Act.

Because of the widespread economic emergency, we conclude that EO 128 did not violate the nondelegation doctrine. Instead, the Governor used his emergency powers to protect the health and welfare of the public, which includes the public economic crisis, and the executive order is a valid exercise of the Governor's powers pursuant to the Disaster Control Act.

In sum, we conclude EO 128 does not violate the doctrine of separation of powers. The Legislature expressly authorized the Governor, pursuant to the Disaster Control Act, to take the actions he took in EO 128.

III.

Appellants further contend that EO 128 violates the contracts clause of the New Jersey Constitution. This argument also lacks merit.

The New Jersey Constitution provides: "The Legislature shall not pass any . . . law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made." N.J. Const. art. IV, § 7, ¶ 3. The New Jersey contracts clause is interpreted similarly to its federal counterpart. In re Recycling & Salvage Corp., 246 N.J. Super. 79, 100-01 (App. Div. 1991). "The contract clause does not deprive the states of their power to adopt general regulatory measures even if those regulatory measures result in the impairment or destruction of private contracts." Ibid. A statute does not violate the contracts clause "simply

because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts prior to [the statute's] enactment." Ibid. (alteration in original) (quoting Exxon Corp. v. Eagerton, 462 U.S. 176, 190 (1983)).

Every contract is subordinate to the laws of nature and of the community, and the State may make laws for the common welfare even if those laws conflict with or affect individual contracts. Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 435-36 (1934). In fact, a temporary restraint on private contracts may become necessary when the State is addressing "a great public calamity." Ibid.

Contract impairment claims involves "three inquiries: (1) whether a contractual right exists in the first instance; (2) whether a change in the law impairs that right; and (3) whether the defined impairment is substantial." Berg v. Christie, 225 N.J. 245, 259 (2016). The first two inquiries are typically resolved easily, and courts focus on the severity of the impairment. Gen. Motors Corp. v. Romein, 503 U.S. 181, 186 (1992). To determine whether the government action has created a severe impairment of a private contract requires "a careful examination of the nature and purpose of the state legislation." Allied Structural Steel Co. v. Vill. of Schaumburg, 438 U.S. 234, 245 (1978).

A-1584-20

In analyzing whether the state law operates as a substantial impairment, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." Sveen v. Melin, 138 S. Ct. 1815, 1822 (2018). Whether the parties were operating in a regulated industry is "[a]n important factor in determining the substantiality of any contractual impairment . . . ." Am. Express Travel Related Servs., 669 F.3d at 369 (citing Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co., 459 U.S. 400, 411 (1983)). "When a party enters an industry that is regulated in a particular manner, it is entering subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships are foreseeable." Ibid.

If a court finds that a law substantially impairs a private contract, it must then continue to the second part of the contracts clause analysis and that is whether the State established "a significant and legitimate public purpose" underlying the challenged statute and whether the adjustment in contractual rights is sufficiently related to the governmental objective. Edgewater Inv. Assocs. v. Borough of Edgewater, 201 N.J. Super. 267, 278 (App. Div. 1985) (citing Energy Rsrvs. Grp., 459 U.S. at 411-12).

"States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular . . . ." Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 440 (1982).

> Because past regulation puts industry participants on notice that they may face further government intervention in the future, a later-in-time regulation is less likely to violate the contracts clause where it "covers the same topic [as the prior regulation] and shares the same overt legislative intent to the [sic] protect [the parties protected by the prior regulation]."
>
> [Elmsford, 469 F. Supp. 3d at 169-70 (first and third alteration in original) (quoting All. of Auto. Mfrs., Inc. v. Currey, 984 F. Supp. 2d 32, 55 (D. Conn. 2013)).]

New Jersey has a long history of regulating the residential rental industry, as discussed in Edgewater Inv. Assocs., 201 N.J. Super. at 278 (finding "the State's long history of regulation pertaining to the housing industry" meant that law rendering certain senior citizens immune from eviction for forty years did not substantially impair property owners' contractual rights); Chase Manhattan Bank v. Josephson, 135 N.J. 209, 234-35 (1994) (law extending eviction restrictions to landlord's successors in ownership did not substantially impair contractual rights); and Troy, Ltd. v. Renna, 727 F.2d 287, 297-98 (3d Cir. 1984) (retroactive application of New

Jersey's anti-eviction law did not substantially impair landlords' preexisting contractual rights).

Residential security deposits are also heavily regulated and include requirements as to how a security deposit is paid, maintained, and returned, N.J.S.A. 46:8-19 and -21.1; how much of a security deposit a landlord may require, N.J.S.A. 46:8-21.2; and what happens to the security deposit when the property is conveyed to another person, N.J.S.A. 46:8-20 and -21.

In light of the COVID-19 pandemic, other jurisdictions have recently considered contracts clause challenges to executive orders similar to EO 128. For example, in Elmsford, the court held:

> Again, there is no question that residential leases are subject to a number of regulations that do not implicate the Contracts Clause. For example, "It is well established that [New York] City's rent control laws do not unconstitutionally impair contract rights." Therefore, EO 202.28 – which modifies aspects of the statutory scheme relating to permissible uses of security deposits – should have come as a no surprise to the landlord [p]laintiffs, and thus could not amount to a substantial impairment of their rights under their rental agreements.
>
> [Elmsford, 469 F. Supp. 3d at 170 (internal citations omitted) (quoting Brontel, Ltd. v. City of N.Y., 571 F. Supp. 1065, 1072 (S.D.N.Y. 1983)).]

Similarly, in Auracle Homes, LLC v. Lamont, 478 F. Supp. 3d 199, 224 (D. Conn. 2020), the federal district court found that Connecticut Governor

Lamont's executive order, similar to EO 128, did not substantially impair the plaintiffs' contracts because the housing industry is heavily regulated.

In Johnson, the court provided the following explanation for rejecting appellants' contracts clause argument:

> Similar to the executive order in Elmsford, Executive Order 128 "does not displace the civil remedies always available to landlords seeking to recover the costs of repairs or unpaid rents still owed at the end of a lease term." Just as in Elmsford, nothing in Executive Order 128 "diminishes the tenant's rental obligation by even a nickel" and the changes in Executive Order 128 are temporary. . . . In Elmsford, the court noted, although it was true that a landlord might have to "obtain a judgment for the amount expended in repairs," this "whole scheme is no different than what actually happens in the real world, where tenants routinely forfeit their security deposit by allowing it to 'cover the last month's rent' on a lease." The court further explained "[t]he landlord can collect all he is owed at the end of the day by the simple expedient of going to some court when the courts are fully reopened. The fact that landlords would prefer not to avail themselves of their legal remedies -- because it is often not worth the trouble to pursue a deadbeat tenant -- does not mean that the state has impaired their contractual rights."

> [Johnson, 2021 WL 1085744 at *10 (internal citations omitted) (quoting Elmsford, 469 F. Supp. 3d at 171).]

Appellants argue that EO 128 violates the contracts clause by substantially impairing their leases, claiming they explicitly contracted for the payment and maintenance of security deposits to ensure their tenants met their

40

obligations. Moreover, the Glassboro and Millville leases specifically precluded using security deposits to pay rent.

The test for whether a state law substantially impairs a private contract is the extent to which it undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his [or her] rights." Sveen, 138 S. Ct. at 1822.

A. Undermining appellants' contractual bargain

Here, according to appellants, the State fundamentally altered the parties' obligations under their leases, because their security deposits secure the value of their real property and ensure the tenants' compliance with their contractual obligations. Appellants argue that that EO 128 substantially impaired their private contracts when it removed the incentive for tenants to comply with the terms of their leases and maintain the condition of appellants' properties.

We reject this argument. As the court in Johnson found, EO 128 did not alter the tenants' obligations to pay rent or compensate landlords for damages they caused. Instead, the Johnson court found:

> Executive Order 128 sufficiently safeguards [p]laintiffs' ability to realize the benefit of their bargain. In Executive Order 128, Governor Murphy explicitly allows a landlord to "to recoup from the tenant any monies the landlord expended that would have been reimbursable by the security deposit and

41

interest or earnings thereon, at the time that such reimbursement from the deposit and interest or earnings thereon would have taken place." Moreover, Executive Order 106 explains that Governor Murphy's actions do not "affect any schedule of rent that is due."

[Johnson, 2021 WL 1085744, at *10 (citing Elmsford, 469 F. Supp. 3d at 171).]

Appellants also cite the dissent in Sveen, 138 S. Ct. at 1830 (Gorsuch, J., dissenting), where Justice Gorsuch distinguished between laws that merely alter the means of enforcing a contract from those that actually interfere with contractual obligations. In this regard, Justice Gorsuch expressed that cases relying on Blaisdell to find that there was no substantial impairment of contracts had involved contractual remedies and not contractual obligations. 138 S. Ct. at 1830-31. Justice Gorsuch stated:

Although the Constitution allows legislatures some flexibility to address changing social conditions through retroactive remedial legislation, it does not permit upsetting settled expectations in contractual obligations. We must respect that line found in the text of the Constitution, not elide it. Indeed, our precedent teaches that if remedial changes are just disguised efforts at impairing obligations they will violate the Constitution too.

[Ibid. (citations omitted).]

We reject the contention that EO128 materially altered appellants' ultimate contractual remedies, as tenants' obligations regarding rent and

42

damages were not impaired by EO 128. Thus, we do not find relevant the distinction advanced by Justice Gorsuch.

B.  Interfering with a party's reasonable expectations

According to appellants, the Legislature passed the SDA in 1968 and since that time, New Jersey's security deposit legislation has remained mostly static; therefore, they argue that their reasonable expectations were that it would remain so. Appellants argue they were not put on notice that the Governor might nullify their ability to maintain a security deposit.

This claim lacks merit. A party's reasonable expectations directly relate to whether they operate in a heavily regulated industry; here, appellants operate in the heavily regulated residential rental industry. Thus, appellants' reasonable expectations should have been that in a pandemic, rental contracts might be impacted by the State regulating the use of tenants' security deposits. See Am. Express Travel Related Servs., 669 F.3d at 369 (holding that changes to regulations in a heavily regulated industry are foreseeable).

C.  Preventing the party from safeguarding or reinstating his or her rights

As the court in Johnson found, appellants will be able to enforce their rights by obtaining a judgment against any tenants who default on rent or cause damages; tenants' rental obligations are not diminished by "even a nickel"; in addition, "in the real world, . . . tenants routinely forfeit their

43

security deposit by allowing it to 'cover the last month's rent' on a lease." Johnson, 2021 WL 1085744, at *10 (quoting Elmsford, 469 F. Supp. 3d at 171).

We conclude that EO 128 did not substantially impair appellants' contracts because: it did not undermine their contractual bargains given that they are still able to recover unpaid rent and the cost of damages; it did not prevent them from safeguarding their rights because they are still able to obtain a judgment against tenants who do not meet their obligations; and it did not interfere with their reasonable expectations since they operate in a heavily regulated industry.

Because EO 128 has not substantially impaired appellants' contractual rights, we need not reach the next part of the analysis – whether the State established "a significant and legitimate public purpose" and whether the adjustment in the parties' contractual rights is sufficiently related to the governmental objective. Edgewater Inv. Assocs., 201 N.J. Super. at 278 (citing Energy Rsrvs. Grp., 459 U.S. at 411).

IV.

Lastly, appellants argue that EO 128 violates the due process clause of the New Jersey Constitution. We disagree.

Courts should not reach constitutional questions unless necessary to resolve the appeal. Comm. to Recall Robert Menendez v. Wells, 204 N.J. 79, 95 (2010). The Fourteenth Amendment to the United States Constitution provides that no state may "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. The New Jersey Constitution guarantees that all persons "have certain natural and unalienable rights" including the fundamental right of "acquiring, possessing, and protecting property. . . ." N.J. Const. art. I, ¶ 1. Substantive due process claims are recognized under the New Jersey Constitution. State in Interest of C.K., 233 N.J. 44, 73 (2018).

Our courts apply the same standard as applied under the federal constitution. Roman Check Cashing, Inc. v. N.J. Dep't of Banking & Ins., 169 N.J. 105, 110 (2001). In analyzing due process violations, New Jersey courts consider "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." Greenberg, 99 N.J. at 567.

"[A] statute is invalid on substantive due process grounds if it 'seeks to promote [a] state interest by impermissible means . . . .'" Caviglia v. Royal Tours of Am., 178 N.J. 460, 472 (2004) (second alteration in original) (quoting Greenberg, 99 N.J. at 562).

A-1584-20

The substantive due process doctrine "does not protect individuals from all governmental actions that infringe liberty or injure property in violation of some law." Rather, substantive due process is reserved for the most egregious governmental abuses against liberty or property rights, abuses that 'shock the conscience or otherwise offend . . . judicial notions of fairness . . . [and that are] offensive to human dignity."

[Rivkin v. Dover Twp. Rent Leveling Bd., 143 N.J. 352, 366 (1996) (alterations in original) (citations omitted).]

The federal court in Johnson rejected appellants' due process arguments, explaining that "'[i]t is elementary that procedural due process is implicated only where someone has claimed that there has been a taking or deprivation of a legally protected liberty or property interest,' and that 'possessory interests in property invoke procedural due process protections.'" Johnson, 2021 WL 1085744, at *30 (quoting Abbott v. Latshaw, 164 F.3d 141, 146 (3d Cir. 1998)). "Because Plaintiffs have failed to demonstrate a substantial impairment of their property rights, they 'ha[ve] pointed to no specific constitutional guarantee safeguarding the interest [they] assert ha[ve] been invaded." Ibid. (alterations in original) (quoting Auracle, 478 F. Supp. 3d at 226-27).

Here appellants have not identified a property interest independent of the interests addressed by their Contracts Claims. This is fatal to their due process

46

claims. As the Supreme Court has held, when "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot., 560 U.S. 702, 721 (2010) (citations and internal quotation marks omitted).

Nonetheless, appellants cite Montville Twp. v. Block 69, 74 N.J. 1, 7 (1977), in support of their argument that EO 128 deprives them of the substantive right to protect their real property. We disagree. The security deposits are the property of appellants' tenants. Nothing in EO 128 prevents appellants from protecting their properties by seeking judgments against their tenants for violations of their leases.

Also, appellants claim that the criminal penalties in EO 128 violate their procedural due process rights, citing Band's Refuse Removal, Inc. v. Borough of Fair Lawn, 62 N.J. Super. 522, 553 (App. Div. 1960) ("Established procedures lie at the heart of due process and are as important to the attainment of ultimate justice as the factual merits of a cause."). This claim lacks merit as the Disaster Control Act permits the Governor to criminalize actions that contravene the Governor's emergency orders. Appellants'

47

remaining arguments asserting due process claims lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)E.

In sum, we conclude that EO 128 constitutes a valid exercise of gubernatorial power pursuant to the Disaster Control Act.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION